## EMERT *v.* MISSOURI.

ERROR TO THE SUPREME COURT OF THE STATE OF MISSOURI.

No. 120.   Argued and submitted December 14, 1894.  — Decided March 4, 1895.

A statute of a State, by which peddlers' of goods, going from place to place within the State to sell them, are required, under a penalty, to take out and pay for licenses, and which makes no discrimination between residents or products of the State and those of other States, is not, as to peddlers of goods previously sent to them by manufacturers in other States, repugnant to the grant by the Constitution to Congress of the power to regulate commerce among the several States.

*Machine Co.* v. *Gage*, 100 U. S. 676, approved and followed.

THIS was an information, filed July 27, 1889, before a justice of the peace in the county of Montgomery and State of Missouri, for a misdemeanor, by peddling goods without a license, in violation of a statute of the State, contained in chapter 137, entitled "Peddlers and their licenses," of the Revised Statutes of Missouri of 1879, the material provisions of which are copied in the margin,[1] and which is reënacted as chapter 125 of the Revised Statutes of 1889.

[1] SEC. 6471.   Whoever shall deal in the selling of patents, patent rights, patent or other medicines, lightning rods, goods, wares or merchandise, except books, charts, maps and stationery, by going from place to place to sell the same, is declared to be a peddler.

SEC. 6472.   No person shall deal as a peddler without a license; and no two or more persons shall deal under the same license, either as partners, agents or otherwise; and no peddler shall sell wines or spirituous liquors.

SEC. 6473.   Every license shall state the manner in which the dealing is to be carried on, whether on foot, or with one or more beasts of burden, the kind of cart or carriage, or, if on the water, the kind of boat or vessel to be employed.

SEC. 6476.   Any person may obtain a peddler's license by application to the collector of the county in which he intends to carry on his trade, by paying the amount levied on such license.

SEC. 6477.   There shall be levied and paid, on all peddlers' licenses, a state tax of the following rates: First, if the peddler travel and carry his goods on foot, three dollars for every period of six months; second, if one or more horses or other beasts of burden, ten dollars for every period of six months; third, if a cart or other land carriage, twenty dollars for every

The information alleged that the defendant on June 26, 1889, in that county, " did then and there unlawfully deal in the selling of goods, wares and merchandise, not being books, charts, maps or stationery, by going from place to place, in a cart or spring wagon with one horse, to sell the same, and did then and there, while going from place to place to sell said goods, wares and merchandise aforesaid, unlawfully sell one sewing machine to David Portucheck, without then and there having a license as a peddler, or any other legal authority to sell the same ; against the peace and dignity of the State."

The defendant pleaded not guilty, and was adjudged to be guilty, and sentenced to pay a fine of fifty dollars, and costs. He appealed to the circuit court of the county ; and in that court the parties, for the purpose of dispensing with evidence, agreed in writing, signed by their attorneys, that the case might be decided by the court on the following agreed statement :

" 1st. · That for more than five years last past the Singer Manufacturing Company has been, and still is, a corporation duly organized under the laws of the State of New Jersey, and a citizen of that State.

" 2d. That on and prior to June 26, 1889, E. S. Emert, defendant, was in the employ of said Singer Manufacturing Company on a salary for his services, and at said time, in

---

period of six months ; fourth, if in a boat or other river vessel, at the rate of one dollar per day for any period not less than five days ; and such license may be renewed, at the expiration of the first license, for any period not greater than six months, on payment of fifty cents a day, the number of days to be specified in such license. Any county court may, by an order of record, require all peddlers doing business in their county to pay a license tax, not greater than that levied for state purposes.

SEC. 6478. Every person who shall be found dealing as a peddler, contrary to law or the terms of his license, shall forfeit, if a foot peddler, the sum of ten dollars ; on one or more beasts of burden, twenty-five dollars ; in a cart or other land carriage, fifty dollars ; in a boat or other vessel, one hundred dollars.

SEC. 6479. Every peddler shall, upon the demand of any sheriff, collector, constable, or citizen householder of the county, produce his license, and allow the same to be read by the person making the demand ; and, in default thereof, shall forfeit the sum of ten dollars.

pursuance of said employment, was engaged in going from place to place in said Montgomery county, Missouri, with a horse and wagon, soliciting orders for the sale of Singer sewing machines, having with him in said wagon a certain New Singer Sewing Machine, which, on said day, he offered for sale to various persons at different places in said county; and that on said day the defendant did find a purchaser for said machine, and did sell and deliver the same to David Portucheck in said county.

"3d. That said Singer machine in question was manufactured by said Singer Manufacturing Company at its works in the State of New Jersey, and that said sewing machine belonged to and was the property of said company, and that it was forwarded to this State by said company, and by it delivered to the defendant as its agent for sale on its account, and said machine was sold on account of the said manufacturing company; that said machine was of the value of fifty dollars; that the defendant had no peddler's license at said time."

The court adjudged that the defendant was guilty as charged in the information, and that he pay a fine of fifty dollars, and costs. The defendant moved for a new trial, because the facts in the agreed statement constituted no offence; and because the statute on which he had been charged and convicted, being chapter 137 of the Revised Statutes of 1879, was in contravention of section 8 of article 1 of the Constitution of the United States, and void in so far as it affected him. The motion for a new trial, as well as a motion in arrest of judgment, was overruled; and the defendant, upon the ground that a constitutional question was involved, and assigning as errors the same causes as in his motion for a new trial, appealed to the Supreme Court of the State, which affirmed the judgment. 103 Missouri, 241.

The defendant sued out this writ of error, which was allowed by the presiding judge of that court, upon the ground that there "was drawn in question the validity of a statute of or an authority exercised under said State, on the ground of their being repugnant to the Constitution of the United States, and the decision was in favor of such their validity."

*Mr. Lawrence Maxwell, Jr.,* and *Mr. Seneca N. Taylor* for plaintiff in error.

The plaintiff in error submits that the transaction in which he was engaged and for which he was punished was interstate commerce. If so, it was not competent for the State of Missouri to tax him for the privilege of making the sale. The Singer Manufacturing Company is not contesting the right of the State of Missouri to tax its property within that State *as property* in accordance with the rules governing the taxation of other property, and as the coal was taxed in *Brown* v. *Houston,* 114 U. S. 622. It simply insists that under the Federal Constitution it has the right, in the absence of congressional prohibition, not only to carry the goods which it manufactures in New Jersey into the State of Missouri, but to sell them in that State, and that the State of Missouri has no power to prevent it from making such sales or to tax it for the *privilege.*

I. The tax complained of is not a tax upon the property of the Singer Company in Missouri. The company is taxed upon its property in that State under the general revenue laws of the State. This is an additional tax for the privilege of selling its machines in a certain way.

It is sometimes said that a license tax is in effect a tax upon property, but it is submitted that the statement is not accurate. A tax upon property, as property, is assessed with reference to the amount and value of the property ; but the statute complained of takes no account of the amount or value of property. The tax is in terms and effect a license tax for the privilege of selling or offering to sell goods during a certain time in a certain way, to wit, " by going from place to place and selling the same," without reference to the amount or value of the goods carried or sold.

With respect to the particular machine in question the agreed statement of facts shows nothing more than that it was manufactured by the Singer Company at its works in New Jersey, and was forwarded as a matter of interstate commerce to Emert, as its agent in Missouri, to be sold by him on

its account, and that he made the sale on its account.   It does not appear that Emert ever carried with him or ever sold or delivered any machines save this one, or that he ever carried this machine or had it in his possession at any time prior to the day of sale, and the assumption to the contrary in the opinion of the Supreme Court of Missouri is not warranted by the facts; but if this court shall assume without evidence, especially in a criminal case, that the Singer Company sends its machines from its factory in New Jersey to offices or depots in the State of Missouri, and that they are kept at such agencies for sale, the general revenue laws of the State provide for the taxation of such stocks of machines as property.

Rev. Stats. Missouri, 1889, c. 111, § 6894, provide that "Every person or copartnership of persons, who shall deal in the selling of goods, wares, and merchandise, including clocks, at any store, stand, or place occupied for that purpose, is declared to be a merchant."

Section 6896 provides that "Merchants shall pay an *ad valorem* tax equal to that which is levied upon real estate, on the highest amount of all goods, wares, and merchandise which they may have in their possession or under their control, whether owned by them or consigned to them for sale, at any time between the first Monday of March and the first Monday in June in each year: *Provided,* That no commission merchant shall be required to pay any tax on any unmanufactured article, the growth or produce of this or any other State, which may have been consigned for sale, and in which he has no ownership or interest other than his commission."

Subsequent sections provide for returns and assessments in accordance with the foregoing rule of taxation, so that the Singer Company with respect to stocks of machines held by it at any of its offices in the State is compelled to pay an *ad valorem* tax, equal to that which is levied on real estate, on the highest amounts of goods, wares, and merchandise which it has in its possession or under its control, at any time between the first Monday in March and the first Monday in June in each year.   This writ of error does not involve the right to levy such taxes.

II. The right secured by the Federal Constitution to the citizens of other States to engage in commerce with the citizens of Missouri includes not only the right to import their goods into Missouri, but to sell them there after importation. The right to import is of no benefit, shorn of the right to sell. Missouri can no more prevent or tax the one than the other.

In *Brown* v. *Maryland*, 12 Wheat. 419, Chief Justice Marshall said (p. 439): "There is no difference in effect between a power to prohibit the sale of an article and a power to prohibit its introduction into the country. The one would be a necessary consequence of the other. No goods would be imported if none could be sold."

Again at page 446 he said: "If this power [of Congress to regulate interstate commerce] reaches the interior of a State, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation, but to authorize the importer to sell.

"If this be admitted, and we think it cannot be denied, what can be the meaning of an act of Congress which authorizes importation and offers the privilege for sale at a fixed price to every person who chooses to become a purchaser? How is it to be construed if an intent to deal honestly and fairly, an intent as wise as it is moral, is to enter into the construction? What can be the use of the contract, what does the importer purchase, if he does not purchase the privilege to sell?"

Again, on page 448 he said: "We think, then, that if the power to authorize a sale exists in Congress, *the conclusion that the right to sell is connected with the law permitting importation as an inseparable incident is inevitable.*" And again, on page 449: "It may be proper to add that we suppose the principles laid down in this case to apply equally to importations from a sister State."

The question whether the right to import an article of interstate commerce from one State to another includes by necessary implication the right to sell it was much considered in *Bowman* v. *Chicago and Northwestern Railway*, 125 U. S. 465, but was not decided. The argument there was "that the right of a State to restrict or prohibit sales of intoxicating liquor within its limits, conceded to exist as a part of its police power, implies the right to prohibit its importation, because the latter is necessary to the effectual exercise of the former." "The argument," said Mr. Justice Matthews, "is that a prohibition of the sale cannot be made effective except by preventing the introduction of the subject of the sale; that if its entrance into the State is permitted, the traffic in it cannot be suppressed; but the right to prohibit sales, so far as conceded to the States, arises *only after the act of transportation has terminated*, because the sales which the State may forbid are of things within its jurisdiction."

The views held by Mr. Justice Matthews upon the main question are easily discovered from the following passage from his opinion (page 499): "It is easier to think that the right of importation from abroad and of transportation from one State to another includes, by necessary implication, the right of the importer to sell in unbroken packages at the place where the transit terminates; for the very purpose and motive of that branch of commerce which consists in transportation is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported. Such, indeed, was the point decided in the case of *Brown* v. *Maryland*, 12 Wheat. 419, as to foreign commerce, with the express statement, in the opinion of Chief Justice Marshall, that the conclusion would be the same in a case of commerce among

the States. But it is not necessary now to express any opinion upon the point, because that question does not arise in the present case."

In his separate concurring opinion Mr. Justice Field, after examining the question, says (page 505): "Assuming, therefore, as correct doctrine that the right of transportation carries the right to sell the article imported, the decision in the Kansas case may perhaps be reconciled with the one in this case by distinguishing," etc.

The precise question came up later in *Leisy* v. *Hardin*, 135 U. S. 100. The conclusion of the court is shown by the following passage from the opinion of Mr. Chief Justice Fuller (page 124): "The plaintiffs in error are citizens of Illinois, are not pharmacists and have no permit, but import into Iowa beer, which they sell in original packages, as described. Under our decision in *Bowman* v. *Chicago &c. Railway*, *supra*, they had the right to import this beer into that State, and in the view which we have expressed they had the right to sell it, by which act alone it would become mingled in the common mass of property within the State. Up to that point of time we hold that in the absence of Congressional permission to do so the State had no power to interfere by seizure or any other action in prohibition of importation and sale by the foreign or non-resident importer."

The argument by which this conclusion was reached and the effect of the decision in *Brown* v. *Maryland* are shown in a previous passage from the opinion of the Chief Justice on page 110.

III. If the transaction in which Emert was engaged was interstate commerce, the imposition of a license tax is a "regulation" within the meaning of the Constitution.

In *Brennan* v. *Titusville*, 153 U. S. 289, 304, Mr. Justice Brewer, speaking of *Welton* v. *Missouri*, 91 U. S. 275, said: "It is true that the case turned largely upon the fact of discrimination between products of other States and those of Missouri, but nevertheless the decision is an adjudication that the imposition of a license tax on the peddling of goods is a regulation of commerce." And again, page 298: "It is true,

also, that the tax imposed is for selling in a particular manner, but a regulation as to the manner of sale, whether by sample or not, whether by exhibiting samples at a store or at a dwelling-house, is surely a regulation of commerce."

IV. It is immaterial that the statute "regulates" those who are engaged in internal commerce equally with those engaged in interstate commerce. *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489; *Asher* v. *Texas*, 128 U. S. 129; *Brennan* v. *Titusville*, 153 U. S. 289.

A State cannot prevent a person from engaging in interstate commerce or tax him for the privilege, and it does not acquire the right to do so by also regulating persons engaged in internal commerce of the same sort. The prohibition is not against regulating interstate commerce by a discriminating regulation, but against regulating it at all.

The case of *Machine Co.* v. *Gage*, 100 U. S. 676, overlooks this fundamental distinction. It is the case upon which the decision of the Supreme Court of Missouri is based, and is a constant source of confusion. It is submitted that it should now be overruled in terms as it has been in effect by numerous subsequent decisions of this court.

In *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 497, Mr. Justice Bradley said: "It is strongly urged, as if it were a material point in the case, that no discrimination is made between domestic and foreign drummers — those of Tennessee and those of other States; that all are taxed alike. But that does not meet the difficulty. Interstate commerce cannot be taxed at all, even though the same amount of tax should be laid on domestic commerce or that which is carried on solely within the State. This was decided in the case of *The State Freight Tax*, 15 Wall. 232."

Speaking of the decision in *Robbins* v. *Shelby Taxing District*, Mr. Justice Brewer, in *Brennan* v. *Titusville*, 153 U. S. 289, 304, said: "The statute made no discrimination between those who represented business houses out of the State and those representing like houses within the State. There was, therefore, no element of discrimination in the case, but, nevertheless, the conviction was set aside by this court on the

ground that, whatever the State might see fit to enact with reference to a license tax upon those who acted as drummers for houses within the State, it could not impose upon those who acted as drummers for business houses outside of the State (and who were therefore engaged in interstate commerce) any burden by way of a license tax."

V. It is immaterial that the Singer Company is a corporation. *Gloucester Ferry Co.* v. *Pennsylvania*, 114 U. S. 196; *Crutcher* v. *Kentucky*, 141 U. S. 47.

The doctrine is now firmly settled that interstate commerce by a corporation is entitled to the same protection as when carried on by individuals.

VI. The question, after all, is simply whether the transaction in which Emert was engaged and for which he was punished was interstate commerce. If so, it was not within the regulating power of the State of Missouri. What Emert did was to negotiate the sale of merchandise. That was clearly an act of commerce, and the only question is whether it was domestic commerce or interstate commerce. It is admitted (*Brennan* v. *Titusville*) that if Emert had negotiated the sale prior to the arrival of the machine in Missouri the transaction would have been an act of interstate commerce. Why? Because it was a step taken for the purpose of effecting a sale and delivery in one State of goods from another State. But what difference does it make whether the sale precedes the arrival of the goods or is made contemporaneously with their arrival or after their arrival, provided the goods remain the property of the shipper until sold, and were shipped by him for the sole purpose of being sold in the State to which they were sent. The protection of the Constitution is not confined to interstate commerce in which sale precedes shipment. It extends to all interstate commerce, whether the vendor sells in advance of shipping or whether he accompanies the goods personally or by agent into the foreign State to sell them there as best he can and as soon as he can. It will be noticed that it is not the fact of sale that makes one liable under the Missouri statute. It is for the privilege of *trying* to sell " by going from place to place " that the tax is imposed.

We submit that where a thing like a machine is sent from one State to another for the sole purpose of being there sold, then the State to which it is sent cannot "regulate" the manner in which it shall be sold by forbidding the owner to go "from place to place to sell the same." If the States can establish that regulation, there is no limit to the restrictions which they may impose upon interstate commerce. The only safe doctrine is that announced in *Brown* v. *Maryland* and reaffirmed in *Leisy* v. *Hardin* — that "the right to sell any article imported is. an inseparable incident of the right to import it." It was contended by the dissenting justices in the latter case that this right of sale is subject to the exercise of the police power of the State in the case of deleterious substances, but no such question is involved at bar. Upon the vital question that the Federal Constitution guarantees the right to sell as an inseparable incident of the right to import, there was no disagreement. We respectfully submit that the judgment should be reversed.

*Mr. R. F. Walker*, Attorney General of the State of Missouri, for defendant in error, submitted on his brief.

Mr. Justice Gray, after stating the case, delivered the opinion of the court.

From early times, in England and America, there have been statutes regulating the occupation of itinerant peddlers, and requiring them to obtain licenses to practise their trade.

In Tomlin's Law Dictionary are these definitions: "*Hawkers*. Those deceitful fellows who went from place to place, buying and selling brass, pewter, and other goods and merchandise, which ought to be uttered in open market, were of old so called; and the appellation-seems to grow from their uncertain wandering, like persons that with *hawks* seek their game where they can find it. They are mentioned in Stat. 33 Hen. VIII, c. 4." "*Hawkers, Pedlars, and Petty Chapmen*. Persons travelling from town to town with goods and merchandise. These were under the control of commissioners for

licensing them for that purpose, under Stats. 8 & 9 Wm. III, c. 25 ; 9 & 10 Wm. III, c. 25 [9 Wm. III, c. 27] ; 29 Geo. III, c. 26."

The act of 50 Geo. III, c. 41, repealed the prior acts, and imposed a penalty on " any hawker, pedlar, petty chapman, or any other trading person or persons, going from town to town, or to other men's houses, and travelling, either on foot, or with horse or horses," and exposing to sale, or selling goods, wares or merchandise by retail. Upon an information in the Court of Exchequer to recover penalties under that act, Baron Graham said : " The object of the legislature, in passing the act upon which this information is founded, was to protect, on the one hand, fair traders, particularly established shopkeepers, resident permanently in towns or other places, and paying rent and taxes there for local privileges, from the mischiefs of being undersold by itinerant persons, to their injury ; and, on the other, to guard the public from the impositions practised by such persons in the course of their dealings ; who, having no known or fixed residence, carry on a trade by means of vending goods conveyed from place to place by horse or cart." *Attorney General* v. *Tongue,* (1823) 12 Price, 51, 60.

In Massachusetts, both before and after the adoption of the Constitution of the United States, successive statutes imposed penalties on hawkers, peddlers and petty chapmen. 7 Dane Ab. 72; Stats. 1713–14, c. 7; (1 Prov. Laws, 720;) 1716–17, c. 10; 1721–22, c. 6; 1726–27, c. 4; (2 Prov. Laws, 47, 232, 385;) 1785, c. 2 ; 1799, c. 20; 1820, c. 45; Rev. Stats. 1836, c. 35, §§ 7, 8. The statute of 1846, c. 244, repealing the earlier statutes, imposed a penalty on " every hawker, peddler or petty chapman, or other person, going from town to town, or from place to place, or from dwelling-house to dwelling-house in the same town, either on foot, or with one or more horses, or otherwise carrying for sale, or exposing to sale, any goods, wares or merchandise," (with certain exceptions,) without first obtaining a license, as therein provided.

In a case under that statute, Chief Justice Shaw said : " The leading primary idea of a hawker and peddler is that of an

itinerant or travelling trader, who carries goods about, in order to sell them, and who actually sells them to purchasers, in contradistinction to a trader who has goods for sale and sells them in a fixed place of business. Superadded to this, (though perhaps not essential,) by a hawker is generally understood one who not only carries goods for sale, but seeks for purchasers, either by outcry, which some lexicographers conceive as intimated by the derivation of the word, or by attracting notice and attention to them as goods for sale, by an actual exhibition or exposure of them, by placards or labels, or by a conventional signal, like the sound of a horn for the sale of fish. But our statute goes further, and not only proscribes actual hawkers and peddlers, whose employment is that of travelling traders, and thus seems to refer to a business or habitual occupation; but it extends to all persons, doing the acts proscribed." *Commonwealth* v. *Ober*, (1853) 12 Cush. 493, 495.

In that case, it was objected that the statute was repugnant to the Constitution of the United States, because at variance with the exclusive right of Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. To which Chief Justice Shaw answered: "The law in question interferes with none of these." "We consider this as wholly an internal commerce, which the States have a right to regulate; and, in this respect, this law stands on the same footing with the laws regulating sales of wine and spirits, sales at auction, and very many others, which are in force and constantly acted upon." 12 Cush. 497.

In Michigan, a city ordinance, passed under authority of the legislature, prohibiting peddling without a license from the mayor, was held constitutional; and Chief Justice Cooley said: "That the regulation of hawkers and peddlers is important, if not absolutely essential, may be taken as established by the concurring practice of civilized States. They are a class of persons who travel from place to place among strangers, and the business may easily be made a pretence or a convenience to those whose real purpose is theft or fraud. The

requirement of a license gives opportunity for inquiry into antecedents and character, and the payment of a fee affords some evidence that the business is not a mere pretence." *People* v. *Russell*, (1883) 49 Mich. 617, 619.

In the courts of many other States, statutes imposing a penalty for peddling, without a license, all goods of particular kinds, and not discriminating against goods brought from other States, or from foreign countries, have been held not to be repugnant to the Constitution of the United States. *Cowles* v. *Brittain*, (1822) 2 Hawks, 204; *Wynne* v. *Wright*, (1834) 1 Dev. & Bat. 19; *Tracy* v. *State*, (1829) 3 Missouri, 3; *Morrill* v. *State*, (1875) 38 Wisconsin, 428; *Howe Machine Co.* v. *Cage*, (1876) 9 Baxter, 518; *Graffty* v. *Rushville*, (1886) 107 Indiana, 502; *State* v. *Richards*, (1889) 32 West Virginia, 348; *Commonwealth* v. *Gardner*, (1890) 133 Penn. St. 284.

The statute of Missouri, under which the conviction in the case at bar was had, is contained in a separate chapter of the Revised Statutes of the State, entitled "Peddlers and their licenses," and relating to no other subject. By this statute, "whoever shall deal in the selling of" any goods, wares or merchandise, (except books, charts, maps and stationery,) "by going from place to place to sell the same, is declared to be a peddler;" and is prohibited from dealing as a peddler without a license. Rev. Stat. of 1879, §§ 6471, 6472. The license is required to state how the dealing is to be carried on, whether on foot, or with one or more beasts of burden, a cart or wagon, or a boat or vessel; and may be obtained by any person paying the tax prescribed, according to the manner in which the business is carried on. §§ 6473, 6476, 6477. Any person dealing as a peddler, without a license, whether with a pack, a wagon, or a boat, is to pay a certain penalty, which, in the case of peddling in a cart or wagon, is fifty dollars. § 6478. And any peddler, who refuses to exhibit his license, on demand of a sheriff, collector, constable, or citizen householder of the county, is to forfeit the sum of ten dollars. § 6479.

The facts were agreed, that the Singer Manufacturing Company, for more than five years last past, and on the day in question, was a corporation of New Jersey; that the defend-

ant, on and prior to that day, was in the employment of that company, and on that day, in pursuance of that employment, and having no peddler's license, was engaged in going ˙from place to place in Montgomery county in the State of Missouri, with a horse and wagon, soliciting orders for the sale of the company's sewing machines, and having with him in the wagon one of those machines, the property of the company, and manufactured by it at its works in New Jersey, and which it had forwarded and delivered to him for sale on its account ; and that he offered this machine for sale to various persons at different places, and found a purchaser, and sold and delivered it to him.

The Supreme Court of the State, in its opinion, understood and assumed the effect of those facts to be as follows: " The defendant was engaged in going from place to place, selling and trying to sell sewing machines, in Montgomery county in this State,. and had been so engaged for some years. He carried the machines with him in a wagon, and on making a sale delivered those sold to the purchaser. He was not only soliciting orders, but was making sales and delivering the property sold. These acts bring him clearly within the statutory definition of a peddler; and, having no license from the State, he became liable to the penalties imposed by the statute, unless, for any reason, he was exempt from the operations of the law." 103 Missouri, 247. It is argued by one of his counsel that this was an unwarranted conclusion from the facts agreed. But the construction of those facts does not present a Federal question, except so far as it involves the constitutionality of the statute. Upon any construction, it is clear that the defendant was engaged in going from place to place within the State, without a license, soliciting orders for the sale of sewing machines, having with him in the wagon at least one of those machines, and offering that machine for sale to various persons at different places, and that he finally sold it, and delivered it to the purchaser. The conclusion that such dealings made him a peddler, within the meaning of the statute of the State, and of the information on which he was convicted, presents of itself no constitutional question.

The facts appear to have been agreed for the purpose of presenting the question whether the statute was repugnant to the Constitution of the United States. This was the only question discussed in the opinion of the Supreme Court of Missouri. And it is the only one of which this court has jurisdiction upon this writ of error.

The defendant's occupation was offering for sale and selling sewing machines, by going from place to place in the State of Missouri, in a wagon, without a license. There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time. His dealings were neither accompanied nor followed by any transfer of goods, or of any order for their transfer, from one State to another; and were neither interstate commerce in themselves, nor were they in any way directly connected with such commerce. The only business or commerce in which he was engaged was internal and domestic; and, so far as appears, the only goods in which he was dealing had become part of the mass of property within the State. Both the occupation and the goods, therefore, were subject to the taxing power, and to the police power, of the State.

The statute in question is not part of a revenue law. It makes no discrimination between residents or products of Missouri and those of other States; and manifests no intention to interfere, in any way, with interstate commerce. Its object, in requiring peddlers to take out and pay for licenses, and to exhibit their licenses, on demand, to any peace officer, or to any citizen householder of the county, appears to have been to protect the citizens of the State against the cheats and frauds, or even thefts, which, as the experience of ages has shown, are likely to attend itinerant and irresponsible peddling from place to place and from door to door.

If this question were now brought before this court for the first time, there could hardly be a doubt of the validity of the statute. But it is not a new question in this court.

The decision at October term, 1879, in the case reported as *Machine Co.* v. *Gage*, 100 U. S. 676, affirming the judgment of the Supreme Court of Tennessee in *Howe Machine Co.* v. *Cage*,

9 Baxter, 518, is directly in point. The facts agreed, upon which that case was submitted, as shown by the record, were as follows : The Howe Machine Company, a corporation of Connecticut, manufactured sewing machines at Bridgeport in that State, and had an office at Nashville in the State of Tennessee, and sent an agent into Sumner county, for the purpose of selling or peddling machines, who travelled through the country, in a wagon with one horse, for the purpose of exhibiting and offering for sale the company's machines ; that the machines offered for sale and sold by him were manufactured in Connecticut, and brought into Tennessee for sale; and that he paid, under protest, a tax required of him under the statutes of Tennessee for the privilege or license to peddle or sell the machines of the company in Sumner County. By those statutes, "all articles manufactured of the produce of the State" were exempt from taxation; and "all peddlers of sewing machines" were required to pay a tax of fifteen dollars. The Supreme Court of Tennessee having held that the latter provision "levied a tax upon all peddlers of sewing machines, without regard to the place of growth or produce of material, or of manufacture," this court, speaking by Mr. Justice Swayne, considered itself "bound to regard this construction as correct, and to give it the same effect as if it were a part of the statute;" and decided that "the statute in question, as construed by the Supreme Court of the State, makes no such discrimination. It applies alike to sewing machines manufactured in the State, and out of it. The exaction is not an unusual or unreasonable one. The State, putting all such machines upon the same footing with respect to the tax complained of, had an unquestionable right to impose the burden." 100 U. S. 677, 679.

It has been strenuously argued that that decision is inconsistent with earlier and later decisions of this court upon the subject of the powers of the several States as affected by the grant by the Constitution to Congress of the power to regulate commerce. It becomes necessary, therefore, to examine those decisions with care, beginning with the earlier ones.

In the leading case of *Brown* v. *Maryland*, (1827) 12

Wheat. 419, in which it was adjudged that a statute of Maryland, requiring, under a penalty, importers or other persons selling foreign goods by the bale or package, to take out and pay for a license, was repugnant to the Constitution of the United States, both as laying an impost or duty on imports without the consent of Congress, and as inconsistent with the power of Congress to regulate commerce with foreign nations, Mr. Taney and Mr. Johnson, for the State of Maryland, argued that the tax was " laid upon the same principle with the usual taxes on retailers, or innkeepers, or hawkers and pedlars, or upon any other trade exercised within the State." 12 Wheat. 425.

Chief Justice Marshall, in answering that argument, said: " This indictment is against the importer for selling a package of dry goods, in the form in which it was imported, without a license.   This state of things is changed if he sells them, or otherwise mixes them with the general property of the State, by breaking up his packages and travelling with them as an itinerant pedlar.   In the first case, the tax intercepts the import as an import in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated, until it shall have contributed to the revenue of the State.   It denies to the importer the right of using the privilege which he has purchased from the United States, until he shall also have purchased it from the State.   In the last cases, the tax finds the article already incorporated with the mass of property by the act of the importer.   He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them.   The same observations apply to plate or other furniture used by the importer.   So, if he sells by auction.   Auctioneers are persons licensed by the State, and if the importer chooses to employ them he can as little object to paying for this service as for any other, for which he may apply to an officer of the State.   The right of sale may very well be annexed to importation, without annexing to it also the privilege of using the officers licensed by the State to make sales in a peculiar way."   12 Wheat. 443.

A like distinction was recognized in the United States Internal Revenue Act of 1862, in which "peddlers" were distinguished from "commercial brokers" and were subjected to a different license tax. Among "commercial brokers" was classed "any person or firm, except one holding a license as wholesale dealer or banker, whose business it is, as the agent of others, to purchase or sell goods, or seek orders therefor, in original or unbroken packages or produce." "Peddlers" were thus defined : " Any person, except persons peddling newspapers, Bibles or religious tracts, who sells or offers to sell, at retail, goods, wares or other commodities, travelling from place to place, in the street, or through different parts of the country, shall be regarded as a peddler, under this act." Act of July 1, 1862, c. 119, § 64, cls. 14, 27; 12 Stat. 457, 458.

In *Woodruff* v. *Parham*, (1868) 8 Wall. 123, it was adjudged by this court, speaking by Mr. Justice Miller, that a uniform tax imposed by ordinance of the city of Mobile, under authority from the legislature of Alabama, on all sales by auction in the city, was constitutional, because it was "a simple tax on sales of merchandise, imposed alike upon all sales made in Mobile, whether the sales be made by a citizen of Alabama or of another State, and whether the goods sold are the produce of that State or some other. There is no attempt to discriminate injuriously against the products of other States, or the rights of their citizens ; and the case is not, therefore, an attempt to fetter commerce among the States, or to deprive the citizens of other States of any privilege or immunity possessed by citizens of Alabama. But a law having such operation would, in our opinion, be an infringement of the provisions of the Constitution which relate to those subjects, and therefore void." 8 Wall. 140.

In *Hinson* v. *Lott*, 8 Wall. 148, decided at the same time, it was adjudged by this court, speaking by the same eminent justice, that a statute of that State. imposing a tax of fifty cents per gallon, to be paid by the distiller, on all intoxicating liquors manufactured within the State, and a like tax, to be paid by the importer, on all intoxicating liquors introduced into the State for sale, was constitutional, on the ground "that

no greater tax is laid on liquors brought into the State than on those manufactured within it," and "that, whereas collecting the tax of the distiller was supposed to be the most expedient mode of securing its payment, as to liquors manufactured within the State, the tax on those who sold liquors brought in from other States was only the complementary provision, necessary to make the tax equal on all liquors sold in the State. As the effect of the act is such as we have described, and it institutes no legislation which discriminates against the products of sister States, but merely subjects them to the same rate of taxation which similar articles pay that are manufactured within the State, we do not see in it an attempt to regulate commerce, but an appropriate and legitimate exercise of the taxing power of the States." 8 Wall. 153.

In *Ward* v. *Maryland*, (1870) 12 Wall. 418, a statute of Maryland, requiring all traders residing within the State to take out licenses at certain rates, and subjecting to indictment and penalty persons not residents of the State, who, without taking out a license at a higher rate, should sell or offer for sale, by card, sample, or trade list, within the limits of the city of Baltimore, any goods, wares or merchandise whatever, other than agricultural products and articles manufactured in the State, was held to be unconstitutional, because it imposed a discriminating tax upon the residents of other States.

In *Welton* v. *Missouri*, (1875) 91 U. S. 275, a statute of Missouri, by which "whoever shall deal in the selling of patent or other medicines, goods, wares or merchandise, except books, charts, maps and stationery, which are not the growth, produce or manufacture of this State, by going from place to place to sell the same, is declared to be a peddler," and which prohibited, under a penalty, dealing as a peddler, without taking out a license and paying a certain sum therefor, but required no license for selling, by going from place to place, any goods, the growth, produce or manufacture of the State, was held, by reason of such discrimination, to be unconstitutional and void as applied to a peddler within the State of sewing machines manufactured without the State. Mr. Justice Field, in delivering judgment, said: "The commercial

power continues until the commodity has ceased to be the subject of discriminating legislation by reason of its foreign character. That power protects it, even after it has entered the State, from any burdens imposed by reason of its foreign origin. The act of Missouri encroaches upon this power in this respect, and is therefore, in our judgment, unconstitutional and void." And he referred to the passages in the opinions in *Brown* v. *Maryland*, and in *Woodruff* v. *Parham*, above cited, as supporting the conclusion. 91 U. S. 282. The statute of Missouri, now before the court, omits the discriminating words, "which are not the growth, produce or manufacture of this State," upon which that decision was grounded.

In *Cook* v. *Pennsylvania*, (1878) 97 U. S. 566, in which a tax upon auctioneers, measured by the amount of their sales, was held to be invalid as to sales by auction of imported goods in the original package, the statute under which the tax was imposed made a discrimination against imported as compared with domestic goods; and the decisions in *Woodruff* v. *Parham*, *Hinson* v. *Lott*, and *Welton* v. *Missouri*, above cited, were referred to as controlling. 97 U. S. 569, 573.

The decision in *Machine Co.* v. *Gage*, 100 U. S. 676, above stated, is thus shown to have been in exact accordance with the law as declared in previous decisions. Indeed, *Woodruff* v. *Parham*, *Hinson* v. *Lott*, *Ward* v. *Maryland*, and *Welton* v. *Missouri*, were cited in its support. 100 U. S. 679.

That decision is no less consistent with the subsequent decisions of this court, as will appear by an examination of them.

In *Webber* v. *Virginia*, (1880) 103 U. S. 344, 347, this court, speaking by Mr. Justice Field, affirmed the doctrine that "the right conferred by the patent laws of the United States to inventors to sell their inventions and discoveries does not take the tangible property, in which the invention or discovery may be exhibited or carried into effect, from the operation of the tax and license laws of the State;" and the reason why a tax imposed by a statute of Virginia upon persons selling, without license, patented articles not owned by them, was

held to be invalid, as applied to sales of sewing machines manufactured in another State, was that the statute made "a clear discrimination in favor of home manufacturers and against the manufacturers of other States." 103 U. S. 350.

In *Brown* v. *Houston,* (1885) 114 U. S. 622, coal brought in flatboats from Pittsburg to New Orleans was still afloat in the Mississippi River after its arrival, in the same boats, and in the same condition in which it had been brought, and was held in order to be sold on account of the original owners by the boatload. Yet this court unanimously decided that a tax imposed by general statutes of the State of Louisiana upon this coal was valid; and, speaking by Mr. Justice Bradley, said : " It was not a tax imposed upon the coal as a foreign product, or as the product of another State than Louisiana, nor a tax imposed by reason of the coal being imported or brought into Louisiana, nor a tax imposed whilst it was in a state of transit through that State to some other place of destination. It was imposed after the coal had arrived at its destination and was put up for sale. The coal had come to its place of rest, for final disposal or use, and was a commodity in the market of New Orleans." " The taxing of goods coming from other States, as such, or by reason of their so coming, would be a discriminating tax against them as imports, and would be a regulation of interstate commerce, inconsistent with that perfect freedom of trade which Congress has seen fit should remain undisturbed. But if, after their arrival within the State — that being their place of destination for use or trade — if, after this, they are subjected to a general tax laid alike on all property within the city, we fail to see how such a taxing can be deemed a regulation of commerce, which would have the objectionable effect referred to." 114 U. S. 632–634.

In *Walling* v. *Michigan,* (1886) 116 U. S. 446, the statute of Michigan, which was held to be an unconstitutional restraint of interstate commerce, imposed different taxes upon the business of selling or soliciting the sale of intoxicating liquors, according as the liquors were manufactured within the State, or were to be sent from another State ; and this court, again

speaking by Mr. Justice Bradley, declared that the police power of the State " would be a perfect justification of the act, if it did not discriminate against the citizens and products of other States in a matter of commerce between the States, and thus usurp one of the prerogatives of the national legislature." 116 U. S. 460.

In *Robbins* v. *Shelby Taxing District*, (1887) 120 U. S. 489, indeed, the majority of the court held that a statute of Tennessee, requiring " all drummers, and all persons not having a regular licensed house of business in the taxing district, offering for sale or selling goods, wares or merchandise therein by sample," to pay a certain sum weekly or monthly for a license, was, as applied to persons soliciting orders for goods on behalf of houses doing business in other States, unconstitutional as inconsistent with the power of Congress to regulate commerce among the several States.

But in the opinion of the majority of the court, delivered by Mr. Justice Bradley, it was expressly affirmed that a State, although commerce might thereby be incidentally affected, might pass "inspection laws to secure the due quality and measure of products and commodities," and "laws to regulate or restrict the sale of articles deemed injurious to the health or morals of the community ;" and might impose "taxes upon persons residing within the State or belonging to its population, and upon avocations and employments pursued therein, not directly connected with foreign or interstate commerce, or with some other employment or business exercised under authority of the Constitution and laws of the United States ;" and also "taxes upon all property within the State, mingled with and forming part of the great mass of property therein ;" although it could not "impose such taxes upon property imported into the State from abroad, or from another State, and not yet become part of the common mass of property therein ; and no discrimination can be made, by any such regulations, adversely to the persons or property of other States ; and no regulations can be made directly affecting interstate commerce." 120 U. S. 493, 494.

The distinction on which that judgment proceeded is

clearly brought out in the following passages of the opinion : " As soon as the goods are in the State and become part of its general mass of property, they will become liable to be taxed in the same manner as other property of similar character, as was distinctly held by this court in the case of *Brown* v. *Houston*, 114 U. S. 622. When goods are sent from one State, to another for sale, or in consequence of a sale, they become part of its general property, and amenable to its laws; provided that no discrimination be made against them as goods from another State, and that they be not taxed by reason of being brought from another State, but only taxed in the usual way as other goods are. *Brown* v. *Houston, qua supra ; Machine Co.* v. *Gage,* 100 U. S. 676. But to tax the sale of such goods, or the offer to sell them, before they are brought into the State, is a very different thing, and seems to us clearly a tax on interstate commerce itself." " The negotiation of sales of goods which are in another State, for the purpose of introducing them into the State in which the negotiation is made, is interstate commerce." 120 U. S. 497.

The decision in *Machine Co.* v. *Gage,* as to a peddler carrying with him for sale goods already in the State, was thus expressly recognized, and was distinguished from the case, then before the court, of a drummer, selling, or soliciting orders for, goods which were at the time in another State. And in the dissenting opinion, delivered by Chief Justice Waite, in which two other justices concurred, it was assumed, as incontrovertible, that another provision of the same statute, requiring a license fee from all peddlers within the district, could not be held unconstitutional in its application to peddlers who came with their goods from another State, and expected to go back again. 120 U. S. 501.

In *Asher* v. *Texas,* (1888) 128 U. S. 129, and in *Brennan* v. *Titusville,* (1894) 153 U. S. 289, the decision in *Robbins* v. *Shelby Taxing District* was followed. *Asher's case* was strictly one of a drummer soliciting orders on behalf of manufacturers residing in another State, and was decided upon the ground that the circumstances in that case and in *Robbins's case* were substantially the same. 128 U. S. 131. In *Bren-*

*nan's case*, it was expressly agreed by the parties that the goods offered by him for sale in Pennsylvania were afterwards sent by their owner in the other State directly to the purchasers. 153 U. S. 290. The case of *Stoutenburgh* v. *Hennick*, (1889) 129 U. S. 141, in which an act of the legislature of the District of Columbia, taxing commercial agents, "offering for sale goods, wares or merchandise, by sample, catalogue or otherwise," was held to be unconstitutional, as applied to a commercial agent offering for sale goods of a Maryland house, did not substantially differ in principle or in circumstances. .

In *Leloup* v. *Mobile*, (1888) 127 U. S. 640, in which a general license tax, imposed by a statute of Alabama on a telegraph company, affecting its entire business, interstate as well as domestic or internal, without discrimination, was held unconstitutional, Mr. Justice Bradley, in delivering judgment, took occasion to observe that "there are sufficient modes in which the internal business, if not already taxed in some other. way, may be subjected to taxation, without the imposition of a tax which covers the entire operations of the company;" and to repeat that "this exemption of interstate and foreign commerce from state regulation does not prevent the State from taxing the property of those engaged in such commerce located within the State, as the property of other citizens is taxed, nor from regulating matters of local concern which may incidentally affect commerce." 127 U. S. 647, 649. See also *Pullman's Car Co.* v. *Pennsylvania*, (1891) 141 U. S. 18; *Ficklen* v. *Shelby Taxing District*, (1892) 145 U. S. 1; *Postal Telegraph Co.* v. *Charleston*, (1894) 153 U. S. 692; *Postal Telegraph Co.* v. *Adams*, (1895) 155 U. S. 688.

In *Dent* v. *West Virginia*, (1889) 129 U. S. 114, this court upheld the validity of a statute of West Virginia, requiring every person practising medicine in the State to obtain a certificate from the state board of health; and, speaking by Mr. Justice Field, said: "The power of the State to provide for the general welfare of its people authorizes it to prescribe all such regulations as, in its judgment, will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud." 129 U. S. 122.

. In *Leisy* v. *Hardin*, (1890) 135 U. S. 100, a statute of a State, prohibiting the sale of intoxicating liquors without a license, was, as applied to a sale of liquors in the original packages and . by the person who had brought them into the State from another State, held to be inconsistent with the power of Congress to regulate commerce among the several States; and that conclusion was reached by applying to the case the rule laid down by Chief Justice Marshall in *Brown* v. *Maryland*, above cited, and stated by the present Chief Justice in these words: "That the point of time, when the prohibition ceases and the power of the State to tax commences, is not the instant when the article enters the country, but when the importer has so acted upon it that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands; that the distinction is obvious between a tax which intercepts the import as an import on its way to become incorporated with the general mass of property, and a tax which finds the article already incorporated with that mass by the act of the importer." 135 U. S. 110. The decision, made at the same time, in *Lyng* v. *Michigan*, was to the same effect. 135 U. S. 161. Presently after those decisions, Congress, by the act of August 8, 1890, c. 728, enacted that all intoxicating liquors or liquids brought into or remaining in a State should, upon their arrival therein, be subject, like domestic liquors, to the operation of laws enacted by the State in the exercise of its police powers. 26 Stat. 313. After Congress had thus, as said by the Chief Justice, "de- . clared that imported liquors or liquids shall, upon arrival in a State, fall within the category of domestic articles of a similar nature," this court unanimously held that intoxicating liquors, brought into a State before this act of Congress, were subject to the operation of the earlier statutes of the State, remaining unrepealed. *In re Rahrer*, (1891) 140 U. S. 545, 560, 564.

In *Plumley* v. *Massachusetts*, decided at the present term, the question, as stated by the court, was, "Does the freedom of commerce among the States demand a recognition of the right to practise a deception upon the public in the sale of

any articles, even those that may have become the subject of
trade in different parts of the country?" After reviewing
many of the cases, citing the passages above quoted from the
opinions in *Walling* v. *Michigan* and in *Dent* v. *West Vir-
ginia*, and distinguishing *Leisy* v. *Hardin*, the court answered
the question in the negative; and therefore held that the
statute of Massachusetts, prohibiting the sale of oleomarga-
rine colored to imitate butter, was constitutional and valid, as
applied to a sale by an agent within the State of articles
manufactured in another State by citizens thereof. 155 U. S.
461, 468, 471–474.

The necessary conclusion, upon authority, as well as upon
principle, is that the statute of Missouri, now in question, is
nowise repugnant to the power of Congress to regulate com-
merce among the several States, but is a valid exercise of
the power of the State over persons and business within its
borders.                                        *Judgment affirmed.*