J. N. HALL, PLAINTIFF IN ERROR, VS. THE STATE
OF FLORIDA, DEFENDANT IN ERROR.

1. The words "hawkers" and "peddlers" are used synonymously
   and interchangeably in the 11th subdivision of section 9,
   chapter 4322, acts of 1895.

2. The words "hawkers" and "peddlers," in that clause of subdi-
   vision 11, section 9, chapter 4322, acts of 1895, reading:
   "Hawkers and peddlers shall each pay for license tax $300,"
   include such persons as are ordinarily and popularly under-
   stood to be such, and the clause defining a peddler to be an
   "unlicensed traveling dealer who shall bargain or sell," etc.,
   was not intended to limit, define or restrain the meaning of
   the words "hawkers and peddlers," but was intended to class
   as peddlers certain dealers not included within the popular
   and ordinary meaning of those words.

3. An indictment against one for carrying on the business of a
   hawker and peddler without license, who is not embraced
   within the popular and ordinary meaning of the words "hawk-
   ers and peddlers," but is embraced within the statutory defi-
   nition beginning "all unlicensed traveling dealers," etc., in
   subdivision 11 of section 9, chapter 4322, acts of 1895, must
   follow the language of this definition; and an indictment in
   the ordinary or common law form for hawking and peddling
   without license, can not be sustained by proof of acts consti-
   tuting one a peddler only by reason of the statutory definition,
   and which would not, independent of such statutory defini-
   tion, constitute him a hawker and peddler within the ordinary
   and popular meaning of those terms.

4. An indictment alleging that defendant, unlawfully, "on the 1st
   day of October, A. D. 1895, and thence continually until the
   finding of this indictment, did engage in, carry on and con-
   duct the business of hawker and peddler, and did, during the
   times and on the days aforesaid, hawk and peddle at divers
   and sundry places in said county, sugar, rice, meat, butter,
   flour and lard, without first having obtained a State license so
   to do, contrary," etc., is sufficient under section 10 and that
   clause of subdivision 11, section 9, chapter 4322, acts of 1895,
   reading: "Hawkers and peddlers shall each pay for license
   tax $300."

5. Where the last clause of a section of a statute is plainly inconsistent with the first portion of the same section, and this first portion conforms to the obvious policy and intent of the Legislature, the last clause, if operative at all, must be so construed as to give it an effect consistent with the first portion of the section and the policy thereby indicated.

6. The last clause of subdivision 11, section 9, chapter 4322, acts of 1895, beginning: "All persons or dealers traveling from place to place," etc., does not include any person who is properly a "hawker and peddler," as ordinarily and popularly understood by those words, used in a previous clause in the same subdivision.

7. One who, as agent for a railroad company, travels about from place to place in a railroad commissary car, carrying with him goods, wares and merchandise belonging to his principal, offering and selling same, for a commission, at retail to employes of his principal only, taking in payment, or as security for the payment, of the purchase price, orders on his principal drawn by the employes against wages earned or to be earned, is a hawker and peddler within the meaning of those words in the clause of subdivision 11, section 9, chapter 4322, acts of 1895, reading: "Hawkers and peddlers shall each pay for license tax $300."

8. The clause of subdivision 11, section 9, chapter 4322 acts of 1895, beginning: "Hawkers and peddlers shall each pay for license tax $300," makes no discrimination between residents and non-residents, nor between products or manufactures of this State and other states. It is not inoperative as an interference with interstate commerce, when applied to a peddler who brings his goods from another State into this State for sale at retail, where the goods are in this State when offered for sale, when orders are taken for them and deliveries made, and where the goods are in this State when all negotiations prior to and attending sales of same are had, and the goods are not sold in original packages, but at retail in small quantities.

Writ of Error to the Circuit Court for Pasco county.

## STATEMENT.

At the spring term, 1896, of the Circuit Court of Pasco county, the plaintiff in error was indicted for hawking and peddling without license. The indictment, omitting formal parts, charged that the defendant unlawfully, on the "first day of October, A. D. 1895, and thence continually until the finding of this indictment, did engage in, carry on and conduct the business of hawker and peddler, and did during the times and on the days aforesaid, hawk and peddle at divers and sundry places in said county, sugar, rice, meat, butter, flour and lard, without first having obtained a State license so to do, contrary," etc. The defendant was by consent tried by the court, without a jury, upon an agreed statement of facts, and at the spring term, 1897, was found guilty and sentenced to pay a fine of $100.

The defendant moved in arrest of judgment upon two grounds: "1st. That the indictment does not sufficiently set out the offense as to bring it within the statute; 2d. That the judgment is illegal in being in the alternative." This motion being overruled, the defendant moved for a new trial upon the following grounds: 1st. That the agreed statement of facts did not show a violation of the statute; 2d. That the court did not give the defendant the benefit of every reasonable doubt arising from the evidence; 3d. That the judgment of the court was not sustained by the evidence. This motion being overruled, the defendant sued out the present writ of error from the sentence imposed upon him, assigning as error, first, that the court erred in denying the motion in arrest of judg-

ment; second, that the court erred in refusing the motion for a new trial. By the agreed statement of facts it appears that the defendant, acting under the written contract hereinafter referred to, did on various dates, within two years next before the finding of the indictment, have attached to the trains on the Savannah, Florida & Western Ry. Co., passing through Pasco county, cars containing various kinds of provisions, merchandise, etc.; that these supply cars were stopped at various section houses along the line of the said railway company in Pasco county, and upon written orders (in the forms hereinafter given) issued to the employes of the railway company provisions from said cars, taking for the same orders on the railway company (in the forms hereinafter given). The storehouse from which the supplies for the car were obtained was located at Montgomery, Alabama, one of the termini of the Plant System. The Savannah Florida & Western Railway was a part of the Plant System. No license was paid by defendant for the conduct of said business. The defendant did not, within two years of the finding of the indictment, sell or offer to sell any goods, wares or merchandise to the public, nor to any other person, except the employes of the company; nor did the defendant solicit the public to buy any goods, wares or merchandise either from himself or his employer, but issued from said cars provisions to the employes of the railway company, only, taking no money therefor, but orders as before stated, though provisions were often issued to employes immediately on their employment, when no wages were due them, to enable such employes to have provisions upon which to begin work without delay.

The original contract between defendant and his

employer, the Alabama Midland Railway Company, was dated October 1, 1889, and by its terms defendant was appointed to take charge of, run and operate for the railway company, and on its account, commissary and supply cars, that is to say, cars from which goods, wares, merchandise, provisions, medicines, rations, etc., were issued and delivered to servants and employes of the company, at such prices as the company might from time to time fix and determine, but to none other than those in the employment of the company, in the several counties through which the railway was operated in Alabama and Georgia; the company agreeing to furnish all cars and supplies to defendant necessary and sufficient to enable him to do the work contemplated by the contract, and to pay defendant as compensation a commission of five *per cent.* on all moneys collected on the company's pay roll, as evidenced of the amount deducted from the wages of the employes, and in part payment thereof for such goods, wares and merchandise as might be furnished and supplied to them from month to month under the contract. The defendant thereby agreed to be subject to the orders and regulations of the superintendent of the company for the management and operation of said cars, and to deliver to employes of the company the supplies and rations, before mentioned, at such places along the line of the railway as the superintendent might direct. The contract contained a provision for its termination by either party under certain conditions. By an endorsement made May 1, 1895, the terms and conditions of said contract were extended to commissary and supply cars over any of the roads and lines or divisions constituting a part of the Plant System, whenever and wherever the

president or general superintendent of the Plant System might direct. The written orders before referred to were in the following forms "Montgomery, Ala., ——, 189—. Plant System Railroad Co., pay J. N. Hall, for value received, the sum of this bill, and deduct from any wages, and thirty days after date I promise to pay and do hereby waive the benefit of all laws exempting real and personal property from levy and sale. John Doe—Bulk meat——. Ham——. Flour——. Meal——. Lard——. Sugar——. Coffee——. Rice——. Grits——. Yeast powders——. Milk——. Tobacco——. Soap——. Syrup——. Shoes——. Merchandise——. John Smith, Sec. Foreman, Sec. No. ——, —— Div." "Montgomery, Ala.,——, 189—. Plant System of Railways Pay to J. N. Hall the amount of this bill furnished me, the sum of ——. Meat——. Flour——. Tobacco——. John Doe, Brakeman emp. on 4th Div." "Montgomery, Ala., ——, 189—. Plant System of Railways Pay to J. N. Hall the amount of this bill furnished me, and thirty days after date I promise to pay, for value received, the sum of $——, and deduct from my wages; and I do hereby waive the benefit of all laws exempting real and personal property from sale. John Doe, Breakman employed on 4th Div. Witness Jno. Smith."

Section 10, Chapter 4322, acts of 1895, provides, among other things, "any person or persons, firm or association, that shall carry on or conduct any business or profession for which a license is required, without first obtaining such license, shall, except in such cases as are otherwise provided for in this act, be guilty of a misdemeanor, and upon conviction, shall be punished by a fine of not more than double

the amount required for such license.'' The eleventh subdivision of section 9 of the same act provides: ''Owners or manages of each boat used, wholly or in part, for peddling, of less than twenty tons, shall pay for a license ten dollars, and for more than twenty tons, shall pay for license, thirty dollars. All traveling picture or book agents, shall pay for license tax ten dollars. Hawkers and peddlers shall each pay for license tax three hundred dollars; provided, the words book agents, peddlers and hawkers shall not apply to vendors of religious books only; provided also, that boats and vehicles engaged in the sale of vegetables and fresh meat, the product of the farm or plantation, and which is butchered upon the farm, and plantation products, fish and oysters, shall not be considered as peddling boats or vehicles. All unlicensed traveling dealers who shall bargain or sell any goods, wares or merchandise, including beers, wines and liquors, for cash or otherwise, by sample or in any other manner, for present or future delivery to any other person whatever, by himself or agent or agents following after to deliver and collect for same, except a licensed dealer, shall be deemed a peddler under this act. This act shall include peddlers of clocks, stoves or ranges, and sewing machine agents, whether selling by sample, or on future delivery, or otherwise; provided, that permanent or locally established agents shall be exempt from the provisions of this section. All persons or dealers, traveling from place to place, selling goods, wares or merchandise of any and all descriptions, shall pay a license tax of fifty dollars in each county; and it shall be unlawful for such persons or dealers to sell or attempt to sell under or by virtue of the license of any other licensed dealer, merchant store-keeper

or druggist; provided, that permanent or locally estab-
lished agents shall be exempt from the provisions of
this section."

The indictment against the defendant was predicated
upon these provisions.

*T. P. Lloyd* and *E. K. Foster*, for Plaintiff in
Error.

### BRIEF OF E. K. FOSTER.

STATEMENT OF THE CASE.—The plaintiff in error
entered into a contract with the General Superinten-
dent of the Plant System of Railways, which contract
was as follows:

STATE OF ALABAMA, }
MONTGOMERY COUNTY. } Know all men by these Pres-
ents, that this agreement entered into this first day of
October, 1889, by and between the Alabama Midland
Railway Company, a corporation organized, created,
and existing under the laws of the State of Alabama,
and J. N. Hall.

Witnesseth, That said Alabama Midland Railway
company has this day appointed the said J. N. Hall
to take charge of, run and operate for it, and on its
account commissary and supply cars; that is to say,
cars from which goods, wares, merchandise, provisions,
medicines, rations, *et cetera*, are to be issued, and de-
livered to servants and employees of said railway com-
pany in the several counties of Alabama and Georgia
through which said railroad is operated, and said con-
tract to exist not less than one year from the execution
thereof, and may continue from time to time, if satis-
factory to both parties, until terminated by mutual
consent; but for the purpose of securing the perform-

ance of this agreement, it is mutually agreed that either party on giving ninety (90) days notice one to the other, after the expiration of twelve months, shall have the right to terminate this contract. The said Alabama Midland Railway Company on its part, its successors and assigns agrees to furnish all cars and supplies to the said J. N. Hall necessary and sufficient to enable him to do the work contemplated by this contract and to pay said Hall as compensation for services to be rendered by him, a commission of five per cent. on all moneys collected on said company's pay roll, as each item of the amount deducted from the wages of the employees and in part payment thereof for such goods, wares, or merchandise as shall be furnished and supplied to them from month to month under this contract, and the said J. N. Hall on his part agrees that he shall be subject to the orders and the regulations of the superintendent of the said Alabama Midland Railway Company for the management and operation of said commissary or supply cars, and will deliver to employees of said company the supplies and rations hereinbefore mentioned and described, at such places along the line of said railroad as the superintendent may from time to time designate and direct.

In testimony whereof we have hereunto set our hands and seals in duplicate this the day and year above written.

THE ALABAMA MIDLAND RAILWAY CO.,
By B. DUNHAM, Supt.
J. N. HALL.

SAVANNAH, GA., May 1st, 1895.
For value received, it is mutually agreed by and between the undersigned that the said J. N. Hall will

operate commissary and supply cars, upon the terms set forth in the within, to-wit: The Alabama Midland Railway Company, contract over any of the roads or lines or divisions constituting a part of the Plant System, whenever and wherever in the future he may be directed so to do by either the president or general superintendent of the Plant System of Railways: The purpose of this agreement being to avoid the necessity of making new and separate contracts for each division of said system.

B. DUNHAM,
Supt. Plant System.
J. N. HALL.

Under the foregoing contract is admitted by both State and defendant upon an agreed state of facts submitted to the judge in the court below that J. N. Hall did on various dates, within two years next before the finding of the indictment in this case, have attached to the trains on the S. F. & W. Railroad Company, passing through the county of Pasco, State of Florida, cars containing various kinds of provisions, merchandise and so forth; that said supply car was stopped at various section houses along the line of said railroad company in Pasco county, and upon written orders [copies of which are below] issued to the employees of said railroad provisions from said car, taking for the same, orders on the railroad company [copies of which are below]. The storehouses from which supplies for the car were got are in Montgomery, Ala., one of the termini of the Plant System. The S. F. & W. railroad is a part of the Plant System. No license is paid for conducting said business. It is also admitted (see statement of agreed facts in bill of exceptions) that neither the defend-

-ant, nor the railroad he represents as agent, has sold or offered for sale within two years from the finding of said indictment any goods, wares or merchandise to the public, nor to any other person; nor does the defendant or said railroad offer to solicit the public to buy any goods, wares or merchandise from either of them. That the defendant and said railroad company from said cars only issue provisions to employees of said railroad company and for said provisions take no money from said employees, but orders, [copies are below]. It is a fact that often provisions are issued to employees immediately on their employment when no wages are due them, but to enable such employees to have provisions upon which to commence work without delay.

The following is a copy of the orders used.

MONTGOMERY, ALA., Aug. 6, 1896.

Plant System of Railways—Pay J. N. Hall for value received, the sum of this bill, and deduct from my wages; and thirty days after date I promise to pay, and do hereby waive the benefit of all laws, exemptions, real and personal property from levy and sale.

JOHN DOE.

| | |
|---|---|
| Bulk Meat.................$ 1.50 | |
| Ham...................... | |
| Flour...................... | 1.00 |
| Meal...................... | |
| Lard...................... | |
| Sugar...................... | |
| Coffee...................... | |
| Rice ... .................. | |
| Grits .................... | |
| Yeast Powders............ | |

Milk........................
Tobacco....................        .20
Soap.......................
Syrup......................
Shoes......................
                                ————
Merchandise...............$ 2.70
                    [Signature] Jno. Smith,
                Sec. Foreman No. 10, 4th Division.
$2.70.                                          4483
            Montgomery, Ala., Aug. 6, 1896.

Plant System Railroad Company—Pay to J. N. Hall the amount of this bill, furnished me the sum of:

Meat......................$ 1.50
Flour.....................  1.00
Tobacco...................   .20
                         ————
                    .        $ 2.70
            Brakeman employed on 4th Division,
                    [Signed] John Doe.

4486.   $2.70.

            Montgomery, Ala., Aug. 6, 1896.

Plant System of Railway—Pay to J. N. Hall the amount of this bill furnished me, and thirty days after date I promise to pay, for value received, the sum of two and seventy 100ths dollars, and deduct from my wages; and I do hereby waive the benefit of all laws exempting real and personal property from sale.

            Brakeman employed on 4th Division,
                            John Doe.

Witness: Jno. Smith.

The errors assigned are that the court erred in overruling the motion for arrest of judgment.

2. That the court erred in refusing to grant the motion for new trial.

First Error. The motion for arrest of judgment was on two grounds:

1st. That the indictment does not sufficiently set out the offense to bring it within the statute.

2d. That the judgment is illegal in being in the alternative.

The indictment is as follows: "In the name and by the authority of the State of Florida, in the Circuit Court of the Sixth Judicial Circuit of the State of Florida for Pasco county, at the spring term thereof, in the year of our Lord one thousand eight hundred and ninety-six, Pasco county, to-wit:

The grand jurors of the State of Florida, inquiring for the county of Pasco, upon their oaths do present that J. N. Hall, whose christian name is to the jurors unknown, late of the county of Pasco aforesaid, in the circuit and State aforesaid, laborer, on the first day of October, in the year of our Lord one thousand eight hundred and ninety-five, with force and arms at and in the county of Pasco aforesaid, unlawfully, on said first day of October, in the year of our Lord one thousand eight hundred and ninety-five, and thereto continually until the finding of this indictment, did engage in, carry on and conduct the business of hawker and peddler, and did during the times and on the days aforesaid hawk and peddle at divers and sundry places in said county, sugar rice, meat, butter, flour and lard, without first having obtained a State license therefor so to do, contrary to the form of the statute in such case made and provided, and against

the peace and dignity of the State of Florida.

W. A. CARTER,

State's Attorney for the Sixth Judicial Circuit of the State of Florida. Prosecuting for said State.

Endorsements on Indictment: "In Pasco county, State of Florida vs. J. N. Hall—Indictment for peddling without license. To the Spring Term, A. D. 1896. A true bill.

JEFF. D. SUMMER, Foreman."

"Witness: J. H. FIELD.

Filed April 17th, 1896.

H. H. HENLY, Clerk.

W. A. CARTER, State's Attorney."

The statute under which this indictment is brought is found on the 12th page of the Laws of Florida for the year 1895, and is part of Chapter 4322, entitled An Act for the Assessment and Collection of Revenue, and reads as follows: "Hawkers and peddlers shall each pay for license tax three hundred dollars: Provided, the words book agents, peddlers and hawkers shall not apply to vendors of religious books only: Provided, also, that boats and vehicles engaged in the sale of vegetables and fresh meats, the product of the farm or plantation, and which is butchered upon the farm, and plantation products, fish and oysters shall not be considered as peddling boats or vehicles.

All unlicensed traveling dealers who shall bargain or sell any goods, wares or merchandise, including beers, wines and liquors, for cash or otherwise, by sample or in any other manner, for present or future delivery to any other person whatsoever, by himself or agent or agents following after to deliver and collect for same, except a licensed dealer, shall be deemed a peddler under this act. This act shall include ped-

dlers of clocks, stoves or ranges, and sewing machine agents, whether selling by sample or on future delivery or otherwise: Provided, that permanent or locally established agents shall be exempt from the provisions of this section.

All persons or dealers traveling from place to place selling goods, wares or merchandise of any and all descriptions, shall pay a license tax of fifty dollars in each county, and it shall be unlawful for such person or dealers to sell or attempt to sell under or by virtue of the license of any other licensed dealer, merchant, storekeeper or druggist; provided, this clause does not apply to articles manufactured in the State of Florida and sold to dealers only.

The penalty is established by section 10 of Chapter 4322, Laws of Florida, which reads as follows: "Any person or persons, firm or association that shall carry on or conduct any business or profession for which a license is required, without first obtaining such license, shall, except in such cases as are otherwise provided for in this act, be guilty of a misdemeanor, and upon conviction shall be required to pay a fine of not more than double the amount required for said license."

We will first notice the ground of the motion in arrest of judgment, which is:

That the indictment does not sufficiently set out the offense to bring it within the statute.

We maintain that the statute makes and treats hawking and peddling without a license as two distinct offenses. Under the statute a hawker must pay a license and a peddler must pay a license. The statute requiring the license reads: "Hawkers and peddlers shall each pay for license tax three hundred dollars." It is well enough in this connection to ascertain whether

two distinct meanings can be given to the words hawk-
ers and peddlers, or whether they are to be treated as
synonymous.

The meaning of the word peddler is given in the
statute itself, and as far as the word peddler is con-
cerned we are bound by it. It is given as follows:

"All unlicensed traveling dealers who shall bargain
or sell any goods, wares or merchandise, including
beers, wines and liquors, for cash or otherwise, by
sample or in any other manner, for present or future
delivery to any person whatsoever by himself or agent
or agents following after to deliver and collect for
same, except a licensed dealer, shall be deemed a ped-
dler under this act."

In the meaning of the word hawker we must turn to
the law dictionary and such authorities as give the
word a legal meaning.

Black's Law Dictionary defines a hawker to be "A
trader who goes from place to place, or along
streets of a town, selling the goods which he carries
with him." Black's Law Dictionary, page 563.

The courts of Massachusetts have defined hawker as
follows: "The leading primary idea of a hawker and
peddler is that of an itinerant or traveling trader who
carries about, in order to sell them, and who actually
sells them to purchasers, in contra-distinction to a
trader who has goods for sale and sells them in a fixed
place of business. Superadded to this (though per-
haps non-essential) by a hawker is generally under-
stood, one who not only carries goods for sale, but
seeks for purchasers, either by outcry which some lex-
icographers conceive as intimated by the derivation of
the word, or by attracting notice and attention to them
as goods for sale, by actual exhibition or exposure of

them by placards or labels, or by a conventional signal, like the sound of a horn for sale of fish." 12 Cushing, 495.

The word hawker is said by some lexicographers to come from the fact that the goods offered to be sold were cried out on the streets, or the public in some unusual way attracted to articles to be sold.

The revenue act of Florida for 1895, the same act under which this indictment is brought, uses the word hawker in another section, and seems to convey the idea of its being one who is a vendor on the streets. Section 9, division 9 of the Act, page 11, Laws of Florida, 1895, reads: "Hawkers or street vendors of medicine, etc."

If we are correct in our construction of the statute, the indictment is bad, for it charges the defendant as being a hawker and peddler in the same count, which should not be done. One count could have been laid charging the offense of being a hawker without a license, and another in the same indictment charging the offense of being a peddler without a license.

The second ground for arrest of judgment is in reference to the sentence.

The courts fixed an alternative of three months in case the fine of $150 was not paid.

The court's attention is called to laws of the State, as set forth in Chapters 4026 and 4075, laws of 1891. If these acts can be construed together, then the court erred in fixing the alternative at three months. The court in considering the two statutes must endeavor to arrive at the intention of the Legislature, and if that can be carried out by a reasonable construction of both statutes, it should be put into effect.

. Section 1st, Chapter 4075, is as follows:

"That from and after the passage of this act no person shall be held in confinement a longer period than sixty days for the non-payment of a fine or fine and costs imposed by sentence of any of the courts of Florida."

"Where there are two acts on the same subject, the rule is to give effect to both if possible;". or as Bishop in his book on statutory crimes expresses it: "The natural expression of the better doctrine would be simply that, where two statutes can be made by construction to subsist together, the latter shall not operate as a repeal of the earlier." We maintain that the two statutes can be read together, and where the fine is under $300 the limit of sentence in lieu of fine is sixty days.

We further maintain that the fine of $150 was excessive; that under a correct interpretation of the act the license could be only $50.

Where there is doubt as to what the penalty is, the courts must favor the lighter penalty.

"Two different punishments for precisely the same offense with no variations in its elements, and no modifying discretion in the courts, cannot on the nature of things exist together. And so are all the authorities to the extent that in these circumstances a milder new punishment repeals a severer one." Bishop's Statutory Crimes, Section 168.

If the license was only $50 for pursuing the business of a peddler in Pasco county, then under the statute $100 was the limit of the fine.

The indictment further fails to properly set out the offense, in that it does not set out that he sold or offered for sale any of the articles mentioned. There is no law that prevents a man from carrying them around

if he wants to, provided he does not sell or offer them for sale. The act describes as a peddler, an unlicensed traveling dealer who bargains and sells. No sale is charged in this indictment.

We will now take up the motion for new trial, which was as follows:

1st. That the agreed state of facts did not show a violation of the statute.

2d. That the court did not give the defendant the benefit of every reasonable doubt arising from the evidence.

3d. That the judgment of the court was not sustained by the evidence.

A case very similar to this came before the Supreme Court of the State of Mississippi. As the case as reported is very brief, we will incorporate it in its entirety here:

Vicksburgh and Meridian Railroad Company vs. State, (62 Mississippi, 105).

[HEAD NOTE]—The fact that a railroad company runs a car over its road containing goods suitable to the wants of its employees, and which are furnished to them in payment of their wages, and no sales being made to other persons, and only to them in payment of their wages, does not make such a car a "trading car" within the meaning of S 585 of the Code of 1880, which imposes a tax for the privilege of running a trading car. A law imposing a prividege tax must be construed favorably to the citizen, and no occupation is to be taxed unless clearly within the provisions of the law.

[DECISION]—The Vicksburg and Meridian Railroad Company was indicted for keeping and running a

"trading car" on its road without having paid the privilege tax imposed upon such business by S 585 of the Code of 1880, and without having obtained the license required. The defendant plead not guilty. At the trial it was proven that the defendant kept and ran a "supply car," which was operated under and in accordance with instructions, as follows:

(1). To sell nothing for money, and under no circumstances to accept any money for goods sold. (2). To sell to no person whose name is not borne on the pay rolls of the company as a laborer or servant; and (3). When sales are made to give the laborer a ticket showing the amount of his purchase, and put the same amount on the pay roll as a payment on account of wages to said laborer.

The court instructed the jury to find defendant guilty, which they did, and from the judgment on such verdict defendant appealed.

Cooper, J.—The fact that the appellant ran a car over its track supplied with provisions and clothing suitable to the wants of its employes, and delivered such supplies to its laborers in payment of the wages due them, selling to no other person, and not to laborers except in payment of wages, did not make it a trader within the popular meaning of that word, nor its car a trading car taxable under Section 585 of the code of 1880. Laws imposing privilege taxes are to be construed in favor of the citizen, and no occupation is to be taxed unless clearly within the provision of such laws. *Ex parte* Taylor, 58 Mississippi, 478.

[Judgment reversed].

Let us see what is admitted by the State in the case at bar:

1st. That defendant contracted with the Plant Sys-

tem to take charge of, run and operate for it and on its account, commissary and supply cars.

2d. That said supply car was stopped at various section houses along the line of said railroad company in Pasco county, and upon written orders upon the railroad company issued provisions to employees of said railroad company, taking for the same as aforesaid written orders on company to be deducted from pay roll.

3d. That the storehouse from which the supplies for the car were gotten is in Montgomery, State of Alabama.

4th. That the defendant had no license.

5th. That neither the defendant nor the railroad company has sold, nor offered for sale, within two years from the finding of the indictment, any goods, wares or merchandise to the public, nor to any other person, nor does the defendant or said railroad company offer to or solicit the public to buy any goods, wares or merchandise from either of them.

6th. That defendant and said railroad company from said cars only issued provisions to employees of said railroad company, and for said provisions took no money from said employees, but orders.

7th. That when necessary, provisions were issued to employees immediately on their employment, when no wages were due them, but to enable such employees to have provisions upon which to commence work without delay.

To become a peddler under the act, the person must be an unlicensed traveling dealer bargaining and selling goods for cash or otherwise, by sample or in any other manner, for present or future delivery to any person whatsoever, by himself or agent following after

to deliver and collect for the same. Acts 1895, page 12 [definition of a peddler].

It is necessary first to determine what is a dealer. Black in his Law Dictionary defines a dealer to be as follows. "A dealer in the popular, and therefore in the statutory sense of the word, is not one who buys to keep, or makes to sell, but one who buys to sell again."

A traveling dealer is one who travels about the country with merchandise to sell.

A dealer sells to any one who will buy, receiving either money or goods in trade. It cannot be contended for one moment that the defendant was what is known as a dealer. The State admits that he did not offer any goods, wares or merchandise to any person that was not an employee of the Plant System. No money was paid.

The defendant derived no profit, his only pay being a commission on what the men ordered. The necessity exists for the supply car. The hands working on sections are away from stores and towns. The company not only employs them daily in maintaining the track, but when not so employed they have to be at their houses, ready for summons and immediate work in case of accident, washouts, etc. In cases of freshets and the washing out of trestles, the hands may be so employed as to be away from provisions for several days, unless they are furnished them by the company. The conduct of the company in having supply cars is not contrary to public policy, not an injury to the citizen. If they are required to pay a license, then an agent could turn his car into the store of a traveling dealer and work serious injury to the mercantile public for he could offer his merchandise to the public

wherever he chose to stop his car. But now it is admitted that the public have no access to it, and cannot buy from it, nor order through it.

Such being admitted by the State, we fail to see how the court below could consider the defendant to be a peddler. The object of the law is to prevent competition on the part of foreign merchants. It will not be claimed for one minute that a citizen who owned three or four plantations in as many different places, could not, upon the request of one of his laborers, buy for that laborer such things as he needed, and charge him for them, and send them to him, by any conveyance, and do it as often as he chose. He would not be a peddler under the statute. We maintain that a railroad company can do the same thing to its employees, provided by so doing they can better protect and maintain their property, and serve the purposes of its charter by maintaining an economic service, and that it enables them to do this there can be no question.

The car was operated for furnishing supplies to employees of the railroad. The State admits that no money was received for the goods delivered. The account of the employees was charged for the value of the goods.

The contract made part of the agreed state of facts shows that the supply car is a part of the Plant System, the goods, etc., furnished to the defendant by the system, and the defendant was nothing but manager in distributing the supplies asked for by the employees.

It may be urged that it was outside of the corporate powers of the railroad company to enter into furnishing the supplies of their workmen. Upon that point we desire to refer to the following cases: In the case

of Chewacla Lime Works vs. Dismukes, Frierson & Co., 87 Alabama, 347, the court says: "There may be circumstances under which a manufacturing company would have implied authority to connect a supply store with the business of the corporation as being auxiliary thereto."

In Alabama Gold Life Insurance Co. vs. Central A. & M. Association, 54 Alabama, 77, the court says: "The capacity to contract is an incidental corporate power, and if the special act of incorporation or the general statutory law is silent as to the contracts which a corporation may enter the corporation has power to make all such contracts as are necessary and proper to enable it to accomplish the purposes of its creation.

"A corporation in the execution of the purpose for which it was created may resort to any means that would be proper for an individual to do in executing the same, unless it is prohibited by the terms of the charter or by some public law." Ohio Life Insurance and Trust Co. vs. the Merchants' Insurance and Trust Co., 11 Humphries 1, American Decisions, Volume 53, page 742.

"There can be no doubt that railroad companies may adopt all improvements in their business which a liberal management and inventive genius can provide." Morawitz Corporations, page 351, citing Mayor of Norwich vs. Norfolk Railway Co.

Reference is also made to Elliott on Railroads, section 340 *et seq.*

Among other positions there laid down it is said: "It is not necessary that the powers of a corporation should be enumerated, nor is it necessary that the power to contract should be expressly conferred, for the power to make such contracts as will promote the

corporate wellfare and enable the corporation to con-duct its corporate affairs is implied.''

No corporation has to depend more on the good con-duct and wellfare of its employees than a railroad com-pany. In its control are the lives of the traveling public. On its dispatch, promptness and integrity depends the business life of the communities through which it goes. Any effort on the part of the company that tends to promote the wellfare of the employee and insure prompt and efficient labor should be encour-aged, and the thrift that is admired in the citizen, who at the same time that he looks after himself he looks after the interest of those in his employ, should be admired in a corporation that strives to exercise care and watchfulness over the interest of their employees.

It is agreed by the State that the storehouses from which the provisions are ordered are situated in Mont-gomery, State of Alabama. The court's attention is called in that connection to the following decisions. Robbins vs. Shelby Co. 120 U. S. 489; Asher vs. Texas, 128, 129.

BRIEF OF T. P. LLOYD, ATTORNEY FOR PLAINTIFF IN ERROR.

1st. The judgment should have been arrested, as the indictment is bad and illegal. In this it does not charge or allege that the plaintiff in error sold the goods as a hawker or peddler, or that he sold goods while going about as such. See Commth. vs. Bruckheimer, 14th Gray (Massachusetts).

2d. In *qui tam* actions where the construction of these statutes has been more liberal, the declaration must aver that the defendant was such a peddler and hawker and that he did sell. See Prigmore vs. Thomp-

son, Minor, Alabama 420; Greer vs. Bumpass Mart & Y (Tennessee); State vs. Aiken, 7 Yerge (Tennessee) Page vs. State, 6th Missouri. An indictment not setting forth to whom the peddler sold is defective. State vs. Powell, 10th Rich (South Carolina).

3d. The indictment charges no crime or offense against the laws of the State for that, the defendant is charged with hawking and peddling sugar, rice, meat, butter, flour and lard, all of which are plantation products, and which the defendant could legally hawk and peddle under sub-section 11 of section 9, Acts Legislature Florida, Chapter 4322, and there is no count or allegation in the indictment showing that the defendant was engaged in business not within the *proviso* of said statute.

4th. That the court should have set aside the judgment and granted a new trial, for that, the judgment was contrary to the law, and against the law applicable to facts in the case. In the construction of statutes and application of statutes to a certain group of facts, the common law and established definitions of certain words, phrases and sentences, used by the Legislature are presumed to be used (unless it appears positively to the contrary), with due and direct reference to said common law and established definitions, for without definition and classification, the law would be "without form and void." Now, the first inquiry is, is the defendant or plaintiff in error a hawker and peddler under the facts and the statute applicable in this case, remembering that the law is directed solely at the occupation. vocation, or temporary status of plaintiff in error, and that plaintiff in error, is indicted for engaging in and conducting the business of a hawker and

peddler. Refering to the established definition of a hawker and peddler we find: "Hawker"—the primary idea of a hawker and peddler is that of an itinerant or traveling trader, who carries goods about for sale and who actually sells them, in contra-distinction to a trader who sells goods in a fixed place of business. Superadded to this, (though perhaps not essential), by a hawker is generally understood one who not only carries goods for sale, but who seeks for purchasers either by outcry or by attracting attention to them as goods for sale, by an actual exhibition or exposure of them, by placards, or labels, or by a conventional sign like the sound of a horn for the sale of fish. Hawking embraces the business of one who sells or offers for sale, on the streets by outcry, or by attracting the attention of persons by exposing his goods in a public place, or by placards, labels or signals. See Commonwealth vs. Ober, 12th Cushing; Commonwealth vs. Farnum, 114th Mass.; Morrill vs. State, 38th Wisconsin; Graffty vs. Rushville, 107th Indiana—Bouver and Anderson's Law Dictionary.

Certainly it can not be that the evidence in the record in this case can bring the plaintiff in error within the definition as established by the authorities quoted. See case of Yellowstone Kit, vs. Randolph (Alabama) 3d So. Rep. 706. In England it appears that hawking and peddling is confined to transactions carried on for profit. See the "Missionary Basket" case of the twelve ladies; Gregg vs. Smith, 8 L. R. Q. B.; 42 L. J. M. C. See the definition of peddler as given in the act of Congress July 1st, 1892. This act was a revenue act.

5th. The facts in this case, we contend, clearly show that the plaintiff in error was and is merely the agent

or employee of the railroad company—manager of the commissary department—the railroad company furnishing all of the articles mentioned in the indictment, and carrying the articles from place to place, or to the places along its road, and the plaintiff in error only issues or distributes them to the employees of the railroad company alone. He does not sell any of the articles to the public nor does he offer to sell to the public, he does not carry the articles, does not take any money for the articles issued, takes only orders on the railroad company. We contend that neither plaintiff in error nor the railroad company are hawkers and peddlers or have they engaged in the business of hawking and peddling in violation of sub section 11, section 9, Chapter 4322 Laws of Florida, 1895, as charged in said indictment. In support of this contention see State vs. Vicksburg and Meridian Railroad Company, 62d Mississippi; also reported American and English railroad cases, Vol. XXIII, page 729.

6th. It will not be denied that railroad companies are held to be quasi-public corporations and agencies, their directors acting in the double capacity as agents for the company and as trustees for the public, clothed with an important public trust. In order to discharge this public trust and perform its many duties imposed upon it, it has the corresponding function, or franchise, or incidental right granted it in the absence of any law to the contrary, to determine what methods, measures or means are proper and necessary to enable it to perform these duties to the public. To discharge its duties to the public, it is absolutely necessary for the corporation to employ, and have in its service a great number of men, contracting for the service of such men upon terms agreed upon between employer

and employee. Some of the terms of this employment may and often do embrace the facts in evidence in this case, such as the issuing of or advancing provisions to employees. Here we have a contract between employer and employes, to do what? To violate any law of the State? No; but to enable the corporation to perform its duties to the public. It would be the irony of tyranny to command, require, or even invite a corporation to run and operate a railroad for the benefit of the public, or for its convenience, and then impose upon it such burdens, limitations and restrictions as to virtually prevent it from performing such duties, and to do this by the imprisoning and imposing of fines and penalties upon its employees, would be an oppression of labor, and an invasion of those inalienable rights pronounced sacred by the fundamental law of the State.

7th. Railroad employees must eat, must have clothing, and their families also. Without this the railroad cannot be operated, and they are perfectly free under Section 1 Bill of Rights to contract with any one to procure and furnish them food and clothing, and the railroad is equally free to furnish all of its employees who require it such food and clothing, and in carrying out this contract the railroad is not "traveling from place to place selling goods to the public, etc.," but the railroad is "at home" at any place along its line, issuing supplies to its own household, and if this is carrying on the business of a hawker and peddler then every farmer, orange grower, tobacco grower, and every person who employs labor and issues supplies to his employees only, is a hawker and peddler.

8th. The freedom of contract embraced in Section 1

Bill of Rights, Constitution of this State, so far as we are informed, has never been invaded or infringed upon by the judicial, legislative or executive departments of the State in branding the acts and facts set out in the record of this case as crime, and hence a violation of the penal laws of the State. To denounce such acts and facts as a crime is to destroy one of the basic principles of democratic institutions and to obliterate individualism, the sole factor for the perpetuation of democratic government. When such acts and facts are declared to be a crime then Section 1 of the Bill of Rights will cease to say to all races and classes of the citizens of the State, *humani nihil a me alienum puto.*

See 113th Pa. St. 431, 33 W. Wa. 179, Ibid 188, 117 Ill. 294, 142 Ill. 380, 141 Ill. 171, 115 Mo. 307.

AUTHORITIES IN SUPPORT OF BRIEF.

Motion in arrest of judgment.—Laws of Fla. 1891, Chapters 4026 and 4075. Revenue Act 1895, Chapter 4322, Section 9.

Sub-divisions 11 and 9. Bishop, Criminal Procedure, 421 *et seq.* 432 *et seq.* Vol. 1. 12 Cushing, 493.

On motion for new trial.—Vicksburg & Meridian Railroad Co. vs. State, 62 Miss. 23 Am. & Eng. Railroad cases, page 729. Chewacla Lime Works vs. Dismukes, Frierson & Co., 87 Ala. 347; Alabama Gold Life Insurance Co. vs. Central A. & M. Asso., 54 Ala. 77; Mayor vs. Norwich & Norfolk R. R. Co., 7 El. & B. L. 397. Morawitz Corporations, sec. ed., Section 364. Ohio L. & L. Co. vs. Merchants, etc., Co., 53 Amer. Dec. 142.

*The Attorney-General*, for Defendant in Error.

### BRIEF OF ATTORNEY-GENERAL.

Assignments of error.

1. The court did not err in overruling the motion in arrest of judgment. The indictment sufficiently sets out the offense. The words "Hawker" and "Peddler" are equivalent terms. See Bouvier's Law Dictionary —words—"Hawker" and "Peddler." Bishop on Statutory Crimes sec. 1074. Originally the words "Hawker" and "Peddler" had a more limited signification than that given now by custom. Higgins vs. Rinker, XL Texas, Reports, bottom of page 402; Com. vs. Cusick Mass. Rpts. Vol. 120, page 183; State vs. Wilson 2d Lea (Tenn.) page 28; Com. vs. Ober, 12th Cushing Reports, 493; Com. vs. Farnum, 114 Mass. Rpts. 267; Maury vs. State, 38 Wis. Rpts. 428; City of Chicago vs. Bartee, 100 Ill. 57; Burbank vs. Mc-Duffee, 65 Me. 135.

The assignment of errors based on the overruling the second ground for arrest of judgment is not tenable. The sentence imposed by the court is warranted by the statute. Chapter 4075 Laws of Florida does not apply unless a person "has been confined in prison sixty days solely for the non-payment of such fine and costs" as might have been imposed upon him by the court. There is nothing of the kind in this case.

2d. Assignment of errors.

This assignment is based upon the overruling the motion for a new trial. Selling on commission does not prevent the traveling trader from being a "Hawker" or "Peddler." Bishop on Statutory Crimes, sec. 1078; Rex vs. Turner, 4 B. & Ald. 510; Dean vs.

King, Ibid. 511; See Allen vs. Sparkhall, 1 B. & Ald. 100; upon this question see Thibeaut vs. Kearney, Lawyers Reports, Annotated, book 18, page 596; Alcorn vs. State, 15 So. Reporter, page 37.

The plaintiff in error, even though confining his sales to employees of the railroad came none the less within the purview of the law prohibiting persons doing that character of business without paying a license therefor.

CARTER, J.:

I. It is insisted by the plaintiff in error that the indictment was bad for duplicity, in that it charged him with two substantive offenses, *viz:* hawking and peddling; that while a hawker is necessarily a peddler, a peddler is not a hawker, unless and until he begins to attract attention to his wares by outcries or other device, and that the Legislature did not use the words interchangeably in the statute under consideration, but used them in a different sense as is evidenced by the language "hawkers and peddlers shall *each* pay," etc. We have failed to find a single case at law where the supposed distinction pointed out by plaintiff in error has ever been enforced, or even recognized, except in the remarks of Chief-Justice *Shaw*, in the case of Commonwealth vs. Ober, 12 Cush. 493, where he said "the leading primary idea of a hawker and peddler is that of an itinerant or traveling trader who carries goods about in order to sell them, and who actually sells them to purchasers, in contradistinction to a trader who has goods for sale, and sells them in a fixed place of business. Superadded to this (though, perhaps, not essential) by a 'hawker' is generally understood one who not only carries goods for sale, but seeks for purchasers either by outcry, which some

lexicographers conceive as intimated by the derivation of the word, or by attracting notice and attention to them as goods for sale by actual exhibition or exposure of them, by placards or labels, or by a conventional signal, like the sound of a horn for the sale of fish.'' It is there admitted, however, that the distinction drawn is not essential, and all of the standard dictionaries to which we have access give one definition of the word *peddler* as "a hawker," and *vice versa*. See the Century and Webster's International, *titles*, Hawker, Peddler. So in many definitions of the terms by the courts and text-writers, the words are regarded as synonymous when undefined by statute. Bishop's Statutory Crimes, section 1074; Fisher vs. Patterson, 13 Pa. St. 335; City of South Bend vs. Martin, 142 Ind. 30, 41 N. E. Rep. 315, S. C. 29 L. R. A. 531; Emert vs. Missouri, 156 U. S. 296, 15 Sup. Ct. Rep. 367. There is nothing in the language quoted from our statute indicating that the Legislature intended to recognize any distinction between the business of a hawker and a peddler. The clause quoted by plaintiff in error, "hawkers and peddlers shall each pay," means no more than "each hawker and peddler shall pay." It was not used to distinguish hawkers from peddlers, but to impose the license upon each person engaged in the business of hawking and peddling, and to prevent the use of one license by more than one person by means of associations and partnerships. A reference to previous legislation in this State, regulating and licensing hawkers and peddlers, shows clearly that from territorial days, these words have been regarded as synonymous and interchangeable. Acts of 1831, 1832 and 1833, pages 373-4 Duval's Compilation; act of 1845, Thompson's Digest,

p. 88, sec. 13, Chaps. 530, 531, acts 1852-3. The revenue act of 1869, Chap. 1713, contained the following clause: "Owners or managers of each boat used wholly or in part for peddling, of less than twenty tons shall pay a license of ten dollars, and of more than twenty-five tons fifty dollars, hawkers and foot peddlers, for each, shall pay a license of ten dollars, peddlers with horse and cart or carriage twenty dollars; provided, that boats and carts engaged in the sale of vegetables or plantation products, fish not by the barrel, or oysters, shall not be considered as peddling boats or carts." This language is significant as it has been substantially re-enacted in every revenue law since that time, except, of course, the amount of the license has not always been the same, and in late statutes the distinction between the amount of license to be paid by foot peddlers and those with horse and cart or carriage has not been kept up; and by late additions to this language in revenue statutes, other classes of itinerant vendors have been placed in the peddling and hawking class, while hawkers, peddlers and itinerant vendors of medicine, etc., have been placed under licenses peculiar to themselves. See Chaps. 1887, 1976, 3099, 3219, 3413, 3681, 3847, 4010 and 4015. There is nothing in the language of the act of 1895 indicating an intention to use the words hawkers and peddlers in any other sense than as synonymous and interchangeable, as had been the case in previous legislation of the same character, extending over a period of sixty years. The indictment was, therefore, not bad for duplicity.

II. It is also insisted that the indictment was bad because it failed to allege that the defendant sold, or offered for sale, any of the articles mentioned therein.

It is argued by plaintiff in error that the statute expressly defines a peddler to be an "unlicensed traveling dealer who shall bargain or sell," etc., and that the indictment must allege a sale in order to charge the offense within this definition. If this clause of the statute was intended to furnish an exclusive definition of the hawker and peddler intended to be taxed, we think the argument would be sound. But this definition was not intended to be exclusive; it was intended to make certain persons peddlers who were not ordinarily and popularly understood to be such. In other words, it was intended to class as peddlers certain persons not meant by the general words "hawkers and peddlers," previously used, and it was not intended thereby to restrict the ordinary and popular and long accepted meaning of those words. Of course an indictment against one not embraced within the general words hawkers and peddlers, but embraced within the statutory definition, must follow the language of this definition, and an indictment in the ordinary or common law form for hawking and peddling can not be sustained by proof of acts constituting one a peddler only by reason of the statutory definition, and which would not, independent of the statutory definition, constitute him a peddler. Bishop on Statutory Crimes, secs. 418, 421; State vs. Henn, 39 Minn. 464, 40 N. W. Rep. 564; People vs. Dumar, 106 N. Y. 502, 13 N. E. Rep. 325. We think the indictment in this case was sufficiently definite to warrant a conviction without a specific allegation that defendant sold goods as a peddler or hawker. It is alleged that defendant did engage in, carry on and conduct the business of hawker and peddler, and did * * * *hawk* and *peddle* cer-

tain named goods at divers and sundry places in the county of Pasco. This was entirely sufficient, for the allegation that he did hawk and peddle goods necessarily implies sales or offers to sell. One sale would not necessarily show that defendant was engaged in the business of peddling and hawking, but the words "did hawk and peddle at divers places," do, in connection with other allegations, show that defendant conducted and carried on the business of a hawker and peddler. Bishop on Statutory Crimes, sec. 1084; Sterne vs. State, 20 Ala. 43; State vs. Sprinkle, 7 Hump. (Tenn.) 36.

III. It is further insisted that the facts agreed upon do not prove the allegations of the indictment: (a) that the defendant, if subject to any license, was a person or dealer traveling from place to place, required to pay a license of $50, and should have been indicted as such; (b) that defendant can not be considered a peddler unless he sold, or offered to sell, to the public generally, and (c) it is suggested that we read the cases of Robbins vs. Shelby County Taxing Dist., 120 U. S. 489, 7 Sup. Ct. Rep. 592, and Asher vs. Texas, 128 U. S. 129, 9 Sup. Ct. Rep. 1, in connection with the fact that the storehouse from which the provisions sold by defendant were obtained, is located in the State of Alabama, from which we infer that defendant contends that, as applied to his case, our statute is inoperative as an interference with interstate commerce.

A. To give the last clause of the section of the statute now under consideration its full natural meaning, would bring it into direct and irreconcilable conflict with a previous clause of the same section imposing a license of $300 on hawkers and peddlers. The obvious legislative policy and intent was to tax hawkers

and peddlers $300 for license. As to this there can be no mistake. A consideration of this statute in connection with previous ones on the same subject leaves no room for doubt as to this point. But it is not to be presumed that the Legislature intended to impose two separate license taxes upon hawkers and peddlers, nor to permit a hawker and peddler to evade the payment of a $300 license by taking out a $50 one. On the contrary, it is clear that the Legislature intended to impose a tax of $300 on such persons as come within the ordinary and popular meaning of the words "hawker and peddler." and a $50 tax upon an entirely different class of persons, *viz:* those persons or dealers who were not hawkers and peddlers, but who traveled "from place to place selling goods, wares or merchandise of any and all descriptions." The latter class were expressly prohibited from selling or attempting to sell under the license of any other licensed dealer, merchant, storekeeper or druggist, and if an unlicensed dealer of this character did bargain or sell any goods, wares and merchandise in the manner defined by the preceding clause of this section, he became a peddler, subject to a license of $300. But it was never intended by this last clause to limit or qualify the meaning of the words "hawker and peddler," used in the previous clause; nor was it intended to include in this last clause any person who properly came under the term hawker and peddler as previously used. It is unnecessary for us to determine at this time the precise definition of "a person or dealer traveling," etc.; what we do determine is that he is some person other than a hawker and peddler in the ordinary and popular meaning of those terms, as used in the previous clause. In so holding we adhere to the rule announced

in Sams vs. King, 18 Fla. 557, that where the last clause of a section of a statute is plainly inconsistent with the first portion of the same section, and this first portion conforms to the obvious policy and intent of the Legislature, the last clause, if operative at all, must be so construed as to give it an effect consistent. with the first portion of the section, and the policy thereby indicated.

B. The evidence shows that the defendant engaged in the business of traveling about from place to place, carrying with him goods, wares and merchandise which he offered and sold at retail. There can be no question that this constituted his business that of a hawker and peddler, within the ordinary and popular meaning of those terms (Bishop's Statutory Crimes, sec. 1074; Fisher vs. Patterson, 13 Pa. St. 335; City of South Bend vs. Martin, 142 Ind. 30, 41 N. E. Rep. 315, S. C. 29₃L. R. A. 531; Emert vs. Missouri, 156 U. S. 296, 15 Sup. Ct. Rep. 367), unless it is relieved of that character by the fact that the goods were sold only to employes of his principal. We are cited to the case of Vicksburg and Meridian Railroad Company vs. State, 62 Miss. 105, where it was held that under a state of facts very similar to those in the present case a railroad ,company was not liable to a tax for the privilege of running "a trading car," the court disposing of the case by remarking that the company under such circumstances was not a trader within the popular meaning of that word, nor was its car a "trading car" taxable under the provisions of the code of that State; that laws imposing privilege taxes were to be construed in favor of the citizen, and no occupation was to be taxed unless clearly within the provisions of such laws. The same

court in a later case (Alcorn vs. State, 71 Miss. 464, 15 South. Rep. 37) held that the owner of a large plantation having numerous tenants, who kept a store from which he furnished supplies to his tenants at usual credit prices, for profit was liable to the privilege tax "on each store" imposed by law, although the owner kept only such goods as were necessary for his tenants and refused to sell to any others. See also Thibaut vs. Kearney, 45 La. Ann. 149, 12 South. Rep. 139. The defendant in the present case sold only to employes of his principal; in other words, to a select class of customers; those who were almost certain to pay. His employers fixed the prices and allowed him a commission on the collections from sales made by him. He was none the less a peddler because he sold only to a few people, or to those of a select class, and refused to sell to others. Suppose he sold only to males, or to females, or to white persons, or to solvent persons, would that alter the facts that he was engaged in the business of traveling about from place to place carrying merchandise, offering and selling same at retail? We think not. The law designed to tax the business of peddling, without reference to its magnitude. We are of opinion that the agreed facts warranted the finding of guilty.

C. The cases referred to by plaintiff in error under this head have been carefully reviewed by the Supreme Court of the United States in the comparatively recent case of Emert vs. Missouri, 156 U. S. 296, 15 Sup. Ct. Rep. 367. A short quotation from that case will dispose of this point. Mr. Justice Gray, speaking for the court, said: "The defendant's occupation was offering for sale and selling sewing machines by going from place to place in the State of Missouri, in a

wagon, without a license. There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time. His dealings were neither accompanied nor followed by any transfer of goods, or of any order for their transfer, from one State to another; and were neither interstate commerce in themselves, nor were they in any way connected with such commerce. The only business or commerce in which he was engaged was internal and domestic, and, so far as appears, the only goods in which he was dealing had become part of the mass of property within the State. Both the occupation and the goods, therefore, were subject to the taxing power, and to the police power of the State." This quotation fully states the facts of this case, except that defendant was selling goods, wares and merchandise, instead of sewing machines, and was traveling in a car, instead of a wagon. The goods were brought into this State for the purpose of sale at retail. They were not even sold in original packages, but were retailed in small quantities at various places. The goods were in this State when orders were taken for them. Deliveries were made at the time of taking the orders. All negotiations prior to and attending the sales were had with reference to goods then present in this State. The clause of the statute under which we sustain this conviction made no discrimination between residents or non-residents, nor between products or manufactures, or this State and other States. This being true, the case of Emert vs. Missouri is conclusive of this question.

The judgment is, therefore, affirmed.