RANGE CO. v. CAMPEN.

(Filed May 24, 1904).

1. INTERSTATE COMMERCE—*Licenses—Sales—Const. U. S., Art. I, sec. 8—Acts 1903, ch. 247.*

 The license tax imposed on every itinerant person peddling ranges is a violation of the constitution of the United States to the extent of sales by sample of goods manufactured in another state, shipped into this state and delivered in their original packages.

2. PEDDLERS—*Hawkers—Licenses.*

 Where ranges are manufactured in one state and sold by sample in another, neither the person exhibiting the sample nor those making delivery thereof in the original packages are peddlers.

ACTION by the Wrought Iron Range Company against A. B. Campen, heard by *Judge Frederick Moore,* at New Bern, N. C., December 2, 1903.

This action was brought to restrain the collection of a license tax and to recover the property levied upon and seized by the sheriff to enforce the payment of it. The case was heard upon the complaint treated as a case agreed, the facts alleged therein being admitted. The complaint is as follows:

The plaintiff complains of the defendant and alleges:

1. That the Wrought Iron Range Company, the plaintiff in this case, is a corporation duly organized and created under the laws of the State of Missouri, with its general offices located in the city of St. Louis, Mo., in which city and State it also has a factory in which are manufactured all the ranges sold by its traveling salesmen throughout the United States, and the plaintiff has been engaged during the year 1903 in selling ranges in Pamlico County, North Carolina, as is hereinafter set out.

2. That the defendant is the duly qualified and acting Sheriff of Pamlico County, North Carolina.

3. That the manner in which said company has sold all its ranges and transacted all its business in Pamlico County, North Carolina, during the year 1903, prior to the filing of this suit, and the manner in which it proposes to hereinafter sell its ranges and conduct its business so long as it remains in said county and State, is as follows:

The agents employed by plaintiff in the sale of its ranges and the transaction of its business in said county and State are as follows: S. D. Dew, officially designated by plaintiff as division superintendent; . . . . . . . . . ., officially designated by plaintiff as traveling salesmen, and . . . . . . . . . . . . . . ., officially designated by plaintiff as deliveryman. Plaintiff has other salesmen and deliverymen operating in North Carolina, but the names only of those operating in Pamlico County in 1903 are hereinbefore set out.

4. That each and every one of said agents of said plaintiff in said county of Pamlico, State of North Carolina, is paid by the plaintiff for his services to said plaintiff a stipulated and contractual compensation, together with his necessary expenses, while engaged in the sale or delivery of plaintiff's ranges, or any other services rendered by them for said plaintiff in said county and State. Further than this stipulated compensation no one of said agents has any monetary or financial interest whatever in the sales, proceeds of sales, or business transacted by plaintiff in said county and State.

5. That each of said agents hereinbefore referred to as traveling salesmen was furnished by plaintiff with a wagon, team and sample range, all of which were and are the sole and undivided property of plaintiff, and each of said salesmen was assigned to a certain and determinate territory in said Pamlico County by the agent hereinbefore referred to as division superintendent.

6. That each of said traveling salesmen, in his appropriate territory within the limits of said Pamlico County, exhibited his sample range to prospective purchasers, and solicited their orders for ranges similar in all respect to the samples exhibited, to be delivered to purchasers within thirty days from date of said orders. In no instance in said county and State did said traveling salesmen solicit orders for, sell or deliver to any purchaser the sample ranges entrusted to them by plaintiff, nor did either of said salesmen deliver any ranges to purchasers in said county and State, the orders for which had been obtained either by himself or the other traveling salesmen hereinbefore referred to.

7. That in all cases in said county and State where orders were obtained by said traveling salesmen, purchasers were required to sign, and did sign and deliver to said salesmen, two promissory notes of equal amount, and of the same tenor and date, one of which was made payable in November, 1904, and the other in November, 1905, conditioned for the delivery at the premises of the purchaser within thirty days from date of a No. 1900 range, same as sample exhibited, and to be void only upon the condition that said plaintiff refused to deliver said range as specified in notes, and for no other cause whatever.

8. That all orders obtained by said salesmen for the future delivery of ranges under the terms and conditions aforesaid, were, by the respective salesmen who obtained or secured said orders, turned over to plaintiff's agent hereinbefore referred to as division superintendent.

9. That said division superintendent, after investigating the financial conditions of said purchaser, selected such as he regarded as responsible for their contracts, turned their orders over to the deliverymen hereinbefore mentioned, delivered to said deliverymen the ranges ordered by said

RANGE CO. *v.* CAMPEN.

purchasers, whereupon said agents proceeded to deliver to said purchasers the ranges according to the terms and conditions specified in the promissory notes hereinbefore mentioned.

10. That for the purpose of making such deliveries, each said deliveryman was furnished with a wagon and team, which were and are the exclusive property of the plaintiff, and said deliverymen, for their services in making said deliveries of ranges, were and are paid a stipulated compensation and their necessary expenses by said plaintiff. Further than the said compensation, said deliverymen have no monetary or financial interest in the sale, proceeds of sales, or business of said plaintiff.

11. That all ranges sold by the plaintiff or its agents in said county and State were sold and delivered to its customers in the original form or packages in which they were shipped into the State of North Carolina from plaintiff's factory in St. Louis, Missouri. All of said ranges were shipped in car-load lots, each car containing sixty separate and distinct ranges, and consigned to plaintiff at New Bern, in Craven County, North Carolina, in care of its said agent, S. H. Dew.

12. That upon the arrival of said ranges at said New Bern, they were unloaded by plaintiff's agents aforesaid and stored in the warehouse of the Atlantic and North Carolina Railroad Company, the common carrier by which they were delivered at said New Bern, and held subject to plaintiff's order.

13. That no ranges were sold or offered for sale at said warehouse, but were taken therefrom only as hereinbefore mentioned, for the purpose of filling orders obtained by the salesmen aforesaid.

14. That all of said ranges used in the transaction of

plaintiff's business in Pamlico County, North Carolina, were unloaded from the cars of the common carrier at said New Bern in the precise form or package in which they were placed in the cars of the common carrier at St. Louis, Missouri, and placed in said warehouse in the same form or packages, and were taken from said warehouse and loaded upon plaintiff's delivery wagons in the same form or packages in which they were shipped from St. Louis, and delivered to plaintiff's customers in Pamlico County in the identical and original form or packages in which they were shipped into the State of North Carolina.

15. That the defendant, claiming the right to do so under section 36, chapter 247, North Carolina Public Laws of 1903, demanded from plaintiff a license tax of one hundred dollars for the business of peddling ranges in said county and State, for one year, ending May 31, 1904, and levied on and seized the property of plaintiff for the purpose of satisfying said tax, and still has the property in his possession sufficient to satisfy said tax, and will sell and dispose of said property to satisfy said tax unless restrained by this Court.

16. That section 36, chapter 247, Public Laws of 1903, in so far as it applied to plaintiff, and the business transacted by it in Pamlico County, North Carolina, is in conflict with Article I, section 8, paragraph 3, of the Constitution of the United States, and therefore, as to the plaintiff and its said business, illegal and unconstitutional, absolutely null, void and invalid.

17. That all ranges sold by its traveling salesmen in said county and State were shipped into said city of New Bern, Craven County, and State, before any of said ranges had been sold, or order for their sale had been solicited, by its salesmen aforesaid. Plaintiff has no place of business in Pamlico

County, or elsewhere in the State of North Carolina, except as hereinbefore stated.

18. That the said seizure of plaintiff's property is for the purpose of collecting a tax levied for an illegal and unconstitutional purpose, and said levy and seizure is illegal, void and wrongful, and the defendant is threatening to sell plaintiff's property and will sell it to pay said illegal tax, unless restrained by this Court, and the plaintiff will be irreparably injured and damaged by said illegal and wrongful acts of defendant.

19. That a summons has been issued in this action.

Wherefore, the plaintiff demands judgment that the defendant be restrained and enjoined from collecting said tax; that he be restrained from selling or disposing of the property now in his hands belonging to the plaintiff; that the defendant return to the plaintiff the property now in his hands; for costs and for general relief.

The following entries appear on the record: 1. The parties waive a jury trial and agree that the Court may hear the case out of term, as of the Fall Term, 1903, of the Superior Court of Pamlico County, and render a final judgment herein.  2. The parties agree that the facts alleged in the complaint are true, and also agree that the Court may enter a final judgment on them.   Whereupon, argument is heard upon both sides, and it is therefore considered by the Court and adjudged that the restraining order and injunction heretofore issued be and the same is hereby dissolved, and that the defendant go without day and recover his costs of action of the plaintiff and the surety to his prosecution bond.   Plaintiff excepted and appealed.

*Simmons & Ward* and *Shepherd & Shepherd,* for the plaintiff.

*Robert D. Gilmer, Attorney-General,* for the defendant.

RANGE CO. *v.* CAMPEN.

WALKER, J., after stating the case. This appeal presents for our consideration the question whether the imposition of a license tax required of the plaintiff under section 36 of the Revenue Act (Acts 1903, chapter 247) is a valid exercise of the taxing power of the State with reference to the plaintiff's particular business as described in the case agreed, and the decision of that question depends upon whether the exaction of the license tax, as a prerequisite to the exercise of the right to sell its ranges in this State, is a regulation of interstate trade or an interference with its free and unrestricted enjoyment within the meaning of the commerce clause of the Constitution of the United States.

It will enable us the better to understand the limitations which have been placed by that clause of the Constitution upon the right of one State to impose taxes upon the sale of goods brought from another State, if we first ascertain what principles have been settled by the adjudications of the court of last resort having jurisdiction to pass upon that question.

In *Robbins v. Shelby Taxing District,* 120 U. S., 489, the following propositions were established: 1. The Constitution having given to Congress the power to regulate commerce among the several States, that power is necessarily exclusive. 2. That where the power of Congress to regulate is exclusive, the failure of Congress to make express regulations indicates its will that the subject shall be left free from any restrictions, and that any regulation of the subject by the States is repugnant to such freedom. 3. The only way in which commerce between the States can be *legitimately* affected by State laws is when, by virtue of its police power and its juridiction over *persons and property within its limits,* it provides for the security of life and property, or imposes taxes upon *persons residing within the State or belonging to its population, or upon avocations pursued*

*therein not directly connected with foreign or interstate commerce.*

But in making such internal regulations a State cannot impose taxes upon persons passing through the State or coming into it merely for a temporary purpose, especially if connected with interstate or foreign commerce, nor can it impose such taxes upon property imported into the State from abroad or from another State, and not yet become part of the common mass of property therein; and no regulations can be made directly affecting interstate commerce. Any taxation or regulation of the latter character would be an unauthorized interference with the power given to Congress over the subject.

It seems, therefore, with respect to the importation from other States of goods already sold, no license tax can be levied upon them by the State into which they are brought for delivery to the purchaser until they have been mingled with and form a part of the common mass of the property therein, and, even when they are thus commingled, they are still protected against any discriminating tax laid upon them directly or indirectly as imports or by reason of their having been imported into the State, simply because this would be a regulation of interstate commerce inconsistent with that perfect freedom of trade between the States which Congress, by not legislating otherwise, has clearly indicated should exist. We may concede, for the purpose of this discussion, that there is no discrimination under section 36 of the Revenue Act against goods imported from another State, but that all goods of the classes described in that section, whether imported into the State or originally forming a part of the general mass of property therein, are alike subject to the tax without any distinction whatever, so that persons who sell goods which are brought into the State stand upon a basis of equality with those who sell goods already in the State and forming part of the general mass of its property. Assum-

135——33

ing, then, that there has been no discriminating legislation against the sale of imported goods, the question arises as to the time when goods brought into a State for the purpose of sale cease to be articles of interstate commerce só as to become subject to the free and untrammeled exercise of the taxing power of the State.

This question was considered and decided in *Brown v. Maryland,* 12 Wheat., 419, with reference to a tax imposed upon the right to sell goods imported from foreign countries. But the same principle, says *Marshall, C. J.,* applies with equal force to commerce between the States. Referring to the extent of the power, he says: "The power is co-extensive with the subject on which it acts, and cannot be stopped at the external boundary of a State but must enter its interior. If the power reaches the interior of a State and may be there exercised, it must be capable of authorizing a sale of those articles which it introduced. Commerce is intercourse; one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purposes should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the subject of importation, and is an essential ingredient of that intercourse of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right not only to authorize importation but to authorize the importer to sell. We think, then, that if the power to authorize a sale exists in Congress, the conclusion that the right to sell is connected with the law permitting importa-

tion, as an inseparable incident, is inevitable. If the principles we have stated be correct, the result to which they conduct us cannot be mistaken. Any penalty inflicted on the importer for selling the article in his character of importer must be in opposition to the act of Congress which authorizes importation. Any charge on the introduction and incorporation of the articles into and with the mass of property in the country must be hostile to the power given to Congress to regulate commerce, since an essential part of that regulation, and principal object of it, is to prescribe the regular means for accomplishing that introduction and incorporation." Discussing the particular question as to the time when the goods become incorporated with the common mass of property in the State, he says: "This indictment is against the importers for selling a package of dry goods, in the form in which it was imported, without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State by breaking up his packages and traveling with them as an itinerant peddler. In the first case the tax intercepts the import, as an import, in its way to become incorporated with the general mass of property, and denies it the privilege of becoming so incorporated until it shall have contributed to the revenue of the State. It denies to the importer the right of using the privilege which he has purchased from the United States until he shall have also purchased it from the State. In the last case the tax finds the articles already incorporated with the mass of property by the act of the importer. He has used the privilege he had purchased, and has himself mixed them up with the common mass, and the law may treat them as it finds them."

We have quoted at some length from this important case, because we understand that the principles therein established have been accepted as authoritative in all subsequent decis-

ions upon this subject. And they have not been in the least changed since they were first announced, except in so far as it was therein intimated that a State could not tax directly and as property imports from another State, as, in this respect, the rule in regard to the taxation of imports from foreign countries and the rule in regard to imports from another State are not the same, as the Constitution expressly prohibits the taxation, in any form, of imports from foreign countries. *Woodruff v. Parham,* 8 Wall., 138. But in all other respects the decision in the case of *Brown v. Maryland* has remained intact. This will appear by reference to the very recent case of *Railroad v. Sims,* 191 U. S., 441. In that case the Court, at page 449, says: "Upon the other hand, for the past seventy-five years, and ever since the original case of *Brown v. Maryland,* 12 Wheat., 419, we have uniformly held that States have no power to tax directly or by license, upon the importer, goods imported from foreign countries or other States, while in their original packages, or before they have become commingled with the general property of the State and lost their distinctive character as imports. In that case a law of Maryland required importers to take out a license before they could be permitted to sell their imported goods. That was declared to be void, not only as a tax upon imports, but as an infringement upon the power of Congress to regulate commerce. The case is one of the most important decided by this Court, and has been adhered to by a uniform series of decisions since that time."

Questions relating to the interference by State regulations with interstate commerce have frequently been before the Supreme Court of the United States, whose decisions upon them are of course controlling with us. It will suffice to examine only a few of the cases decided by that Court in order to determine whether the law under which the license

tax has been imposed upon the plaintiff is in conflict with the commerce clause of the Constitution and therefore invalid.

It requires, we think, only a careful consideration of these cases, and a correct understanding of their distinguishing features, to fix the limit of the State's power of taxing goods imported from other States.

Some general principles have been settled by actual adjudication which enables us to classify the cases arising out of the power asserted by a State to prohibit the importation of goods from other States. This importation may be prohibited, either directly by forbidding the goods to be brought into the State, or indirectly by imposing a tax in such a way as to restrict the enjoyment of the right to import them, such as a license tax, which is required to be paid before the goods are either delivered, under a contract of sale made before the importation began, or sold after the transit is completed and they have reached their destination in the State.

(1) When the goods are imported from a foreign country into one of the States, the State may not levy a tax upon them either directly or indirectly. No tax can be assessed against them as property *ad valorem* or according to any other principle, nor can any license tax be imposed upon the right to sell them, and this exemption continues so long as they remained in the original packages; and after the packages are broken and they become a part of the common mass of property they are still protected against unfriendly legislation which results in any discrimination against them and in favor of the property which has not been imported into the State. *Brown v. Maryland,* 12 Wheat., 419; *May v. New Orleans,* 178 U. S., 496.

(2) The Constitution of the United States declares that "No State shall, without the consent of Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," and

that Congress shall have power "to regulate commerce with foreign nations and among the several States and with the Indian tribes." It will be seen, from a slight comparison of the two provisions, that the exemption from taxation is more extensive in the case of foreign imports than it is in the case of goods imported from one State into another. In the former case all State taxation on importation is prohibited, while in the latter case it is only forbidden by implication, in so far as it may interfere with the regulation of commerce, over which Congress is given exclusive power and jurisdiction. This is clearly pointed out by *Justice Miller* in *Woodruff v. Parham, supra.* If the tax does not fetter commerce, although it may remotely affect it, it may be levied by the State even if the goods have come from another State. A tax laid directly on the imported goods as property, in like manner and by the same rule as upon other property produced in the State, would be valid if the levy is made after the goods have reached their destination and are at rest in the State. In such a case, and for the purpose of direct taxation, or of such taxation as does not restrict the right of interstate traffic, the imported goods are considered as a part of the general mass of property in the State as soon as they have reached their final destination and are at rest within the State. This principle was restated and applied in the case of *Brown v. Houston,* 114 U. S., 662; *Am. S. & W. Co. v. Speed,* 192 U. S., 500.

(3) We see therefore that the State cannot tax imports from foreign countries at all, and can tax goods from other States only when no discrimination against them and no regulation of commerce results therefrom. In no form of legislation can one State prohibit the importation of goods from another State, provided the commodity the importation of which is forbidden is a legitimate subject of commerce, and this right of importation which is thus protected against

hostile State legislation includes the right to sell the goods in the original packages after they have arrived in the State, and not until such a sale is made do they cease to be articles of interstate commerce and become a part of the general mass of the property in the State. This doctrine was announced in *Brown v. Maryland, supra,* as to foreign imports, and it has been extended by subsequent decisions to imports as between the States, because in this respect both kinds of commerce stand upon the same footing and are protected by the same clause of the Constitution. *Leisy v. Hardin,* 135 U. S., 100; *Lyng v. Mich.,* 135 U. S. 161.

(4) The doctrine that one State cannot directly prohibit the importation into its territory of goods from another State has been extended, or rather applied, to a case where the prohibition was attempted not directly, but by means of a license tax exacted of the importer. In the cases to which we will presently refer, the goods were sold in one State to a person residing in another State and were to be delivered to the purchaser in the latter State. If the importer. cannot sell the goods until he has paid for and received a license, the right of importation is in principle as much restricted, and interstate commerce as much regulated, though perhaps not in the same degree, as in the case of an absolute prohibition. *Brown v. Maryland, supra; Robbins v. Shelby Taxing Dist.,* 120 U. S., 489; *Asher v. Texas,* 128 U. S., 129; *Bennan v. Titusville,* 153 U. S., 289; *Shollenberger v. Pa.,* 171 U. S., 1; *Caldwell v. N. C.,* 187 U. S., 622; *Railroad v. Sims,* 191 U. S., 441; *Ex-parte Hough,* 69 Fed. Rep., 330 The case of *State v. Gorman,* 115 N. C., 721, 25 L. R. A., 810, 44 Am. St. Rep., 494, is clearly distinguishable from our case, though the reasoning of the Court in that case seems to sustain our decision in this case.

(5) The only question remaining for us to consider is whether the principle of *Brown v. Maryland, Robbins v.*

*Shelby Taxing District,* and the other cases just cited, applies to a case like the one at bar, where there is no direct prohibition against the importation of goods from another State nor any license tax exacted of the importer, who, by himself or through his agents, solicits orders by sample for goods to be brought into the State and then delivered, but where the goods are brought into the State, and having reached their destination, and being at rest in the State, are sold from a warehouse of the carrier in the original packages, orders for the goods being first obtained by agents of the importer who solicit the same by exhibiting samples of the goods which are carried from place to place in a wagon, the orders being afterwards filled and deliveries made from the warehouse.

A license tax was required of the plaintiff under section 36 of the Revenue Act of 1903, which is as follows: "On every itinerant person or company peddling clocks, stoves or ranges one hundred dollars per annum for each county in which he or they may peddle the same. The license to be issued by the sheriff of the county, who shall collect said tax and pay the same to the State Treasurer." Section 44 provides that "Any person carrying a wagon, cart or buggy, or travelling on foot for the purpose of exhibiting or delivering any wares or merchandise shall be considered a peddler." Sections 36 and 44 are a part of Schedule B, and section 26 of the Revenue Act, which is the first section of Schedule B, reads as follows: "Taxes in this schedule shall be imposed as license taxes for the privilege of carrying on the business or doing the act named, and nothing in this act contained shall be construed to relieve any person or corporation from the payment of tax as required in the preceding schedule. The license issued under this schedule shall be for twelve months, and shall expire on the 31st day of May of each year."

It will be seen therefore that no person or corporation

has the right to carry on any business taxed under Sched-
ules B and C until the license tax is paid, and every such
person or corporation is required to exhibit the license when
demanded by the sheriff of the county in which the business
is conducted (section 90), and the sheriff is required to
demand payment of the license tax from any person or cor-
poration liable for the same, and a failure to pay the same is
made a misdemeanor.   (Section 87).

It must be admitted that the right to sell is an important
and valuable part of the right to import.  The right to bring
goods into a State for the purpose of selling them there
would be of no value if, when they arrive at their destina-
tion, the right to sell them is prohibited, and even though
there may be no absolute prohibition, any restriction placed
upon the right to dispose of the goods is as much an inter-
ference with the right to import or interstate commerce,
though not perhaps in the same degree, as if the sale of the
goods had been altogether forbidden.  There is no differ-
ence in principle between the two cases.  The proposition,
as is said in *Brennan v. Titusville,* 153 U. S., 287, that a
license tax is a direct burden on interstate commerce is not
open to question.  "It is clear therefore," says the Court,
"that this license tax is not a mere police regulation, simply
inconveniencing one engaged in interstate commerce, and so
only indirectly affecting the business, but is a direct charge
and burden upon that business; and if a State may lawfully
exact it, it may increase the amount of the exaction until
all interstate commerce in this mode ceases to be possible.
And notwithstanding the fact that the regulation of inter-
state commerce is committed by the Constitution to the
United States, the State is enabled to say that it shall not be
carried on in this way, and to that extent to regulate it."
In referring to the case of *Crutcher v. Kentucky,* 141 U. S.,
47, the Court says: "Neither license nor indirect taxation of

any kind, nor any system of State regulation, can be imposed
upon interstate any more than upon foreign commerce; and
all acts of legislation producing any such result are, to that
extent, unconstitutional and void." Numerous authorities
are cited and commented on by the Court in *Brennan v.
Titusville,* which is a very important and instructive case.
The conclusion reached was that within the reasoning of
the cases cited the license tax imposed upon the defendant
for selling by sample goods to be shipped into the State was
a direct burden on interstate commerce, and was therefore
beyond the power of the State. If the right to sell the
imported article is an integral part of the right to import,
and an essential element of it, without which it would not
be complete, what difference can there be between a sale
of the article when it is not in the State and a sale of it after
it has been brought within the State, provided it remains in
the original package of commerce. A license tax was
required of the defendant in *Brown v. Maryland,* 12 Wheat.,
419, who was an importer. He resisted the payment of the
tax and his contention was sustained.

It will be observed that the tax in that case was declared
invalid, not only as being an impost or duty laid on imports
from a foreign country but as being an interference with the
regulation of commerce. The question is discussed in both
aspects and the tax declared illegal upon both grounds.
The words which we have already quoted from the masterly
and unanswerable opinion of the great *Chief Justice* will
be found in that part of it where he is discussing the second
objection to the tax urged by the plaintiff in error (Brown),
the defendant below, which was based solely upon the ground
of its repugnance to that clause of the Constitution com-
mitting to Congress the power to regulate commerce with
foreign nations and among the several States.

It was also settled by *Brown v. Maryland* that imported

goods preserved their character as imports as long as they remained unsold and in the original packages in which they were imported. "This indictment," it is said in that case, "is against the importer for selling a package of dry goods in the form in which it was imported without a license. This state of things is changed if he sells them, or otherwise mixes them with the general property of the State by breaking up his packages and traveling with them as an itinerant peddler." 12 Wheat., 443. If, therefore, as said in *Brown v. Maryland,* and reiterated in subsequent cases, a State cannot impose a license tax on the importer, or on his agent who represents him and who would be protected by the same principle, because it is a restriction upon interstate commerce and a regulation thereof, and if the goods continue to be articles of interstate commerce so long as they remain in the original packages and are unsold, it follows that the tax required to be paid by the plaintiff in this case before selling its ranges in the original packages was an unlawful restraint upon its right to import, which included the right to sell in the manner described in the case agreed, and is therefore void.

When we once concede, as we must, that the power of Congress to regulate commerce among the several States does not stop at the external boundary of a State, but must enter its interior and operate there, and that being "co-extensive with the subject on which it acts," its full force is not spent until there is a sale of the article which is imported, and not then if there is any discrimination against the goods because of their foreign character, the conclusion we have reached would seem to be inevitable. We do not think the cases holding that the goods may be taxed as property as soon as they have come to the end of the transit and are at rest in the State conflict with our view of the case. Nor do the peddler cases (*Machine Co. v. Gage,* 100 U. S., 676;

*Emert v. Missouri,* 156 U. S., 296) have that effect. It does not appear in those two cases that the goods were sold in the original packages, and furthermore the Court bases its decision of them upon the ground that the State was exercising its police power, and the tax was laid in the exercise of that power and not merely for the purpose of raising revenue, as in our case. In *Emert v. Missouri, Justice Gray,* for the Court, says: "There is nothing in the case to show that he ever offered for sale any machine that he did not have with him at the time." And again, "So far as appears, the only goods in which he was dealing had become part of the mass of property within the State." Emert was taxed strictly as a peddler. In the case we have in hand the plaintiff, acting by its agents, was not a peddler within the meaning of that word as fixed by the common law, that is, a person who sold the very goods he carried with him in his pack, or cart, when traveling about from place to place. This Court has defined "peddling" to be "the occupation of an itinerant vender of goods who sells and delivers the identical goods he carries with him, and not the business of selling by sample and taking orders for goods to be thereafter delivered and to be paid for wholly or in part upon their subsequent delivery." *State v. Lee,* 113 N. C., 681, 37 Am. St. Rep., 649; *State v. Frank,* 130 N. C., 724, 89 Am. St. Rep., 885. It has also held that an occupation similar to plaintiff's is not that "of a peddler in the ordinary meaning of the word." *State v. Ninestein,* 132 N. C., 1039. The mere calling the plaintiff a peddler does not make it a peddler for the purpose of laying a tax upon its business as an importer, which interferes with interstate commerce and is in its essence a regulation of the same. In the language of the Court in *Stockard v. Morgan,* 185 U. S., at page 36: "The name does not alter the character of the transaction, nor prevent the tax thus laid from being a tax upon inter-

state commerce." It is undoubtedly true that the Legislature may define who are peddlers and, in the same act, tax them, as this "is equivalent to imposing a tax upon all persons engaged in the occupations therein specified," or whose occupation may come within the definition given in the statute. *State v. Ninestein,* 132 N. C., at page 1043. The word is there used as a mere designation of the person who carries on the business described, but it does not enlarge a class of persons before well known and having a certain and well-defined calling, so as to confer upon the State a power with reference to the regulation of interstate commerce that it did not before have. The law regards not the name, but the substance of the thing, and will look at the real character of the business in determining whether or not the State's power of taxation has been rightfully exercised. In *Range Co. v. Carver,* 118 N. C., at page 335, it is said that in *Emert v. Missouri, supra,* the Court sustained the right of the Legislature to define who shall be a peddler for the purpose of taxation. That is true, but the Court was referring to taxation by the State within its rightful authority, and not to taxation which substantially interferes with the power of Congress to regulate commerce, though nominally it may not do so. We think the decision in that case (*Range Co. v. Carver*) proceeded upon a misconception of the true principle which governs in such cases, and especially did the Court fail to advert to the distinction between the class of cases cited in the opinion and the class to which this case belongs. In the cases of the former class, the Court dealt with the power to tax imported goods as property, or with the right to tax generally when the goods have been once sold or the packages broken and they have been mingled with the mass of property in the State, or with the right of the State to exercise its police power in the particular case, while our case comes within the principle settled by the Court

in *Brown v. Maryland, supra; Robbins v. Taxing District, supra; Brennan v. Titusville, supra,* and other cases involving the same question as we have in this case.

We cannot better close this part of the discussion than by referring to the recent case of *Steel and Wire Co. v. Speed,* 192 U. S., 500, in which *Justice White,* for the Court, delivers an exceedingly able and well-considered opinion, where the principles relating to the right of the States to tax as affected by the commerce clause of the Constitution are stated with great force and clearness, and the case will be found, we think, to sustain the views we have herein expressed.

In the case of *Comrs. v. Harmel,* 166 Pa., 89, 27 L. R. A., 388, the Court draws sharply the distinction between the right of the State, in the exercise of its police power, to tax a peddler or person who delivers the very article he offers for sale at the time he sells it, and a case like ours, and, in reference to a transaction such as the one described in this record, it says: "It must be conceded that these clocks may be sent into this State in manufacturer's packages, and they may be sold in the same packages under the authority of the interstate commerce clause; but once in this State and the package opened by the consignee the disposition of the separate articles at retail is intrastate traffic, and subject to the police regulations that experience may show to be necessary for the protection of citizens in the comfort of their homes and the enjoyment of their property." This is our case exactly. Though it may make no difference in this case, in the view we take of it, whether the license tax was required of the plaintiff for the purpose of revenue, or was imposed merely in the exercise of the police power of the State, it may be well to state that an examination of the Revenue Act will show clearly that the tax was laid as a measure for the collection of revenue. It is placed in the same category, under section

B, with license taxes upon lawyers, physicians, dentists, real estate agents, collectors of rent and others of similar occupations, who are certainly not taxed, in the exercise of the police power, as the proper subjects of police surveillance like "hawkers, peddlers and petty chapmen." This is not a tax levied in the execution of any inspection law or for the purpose of enforcing any mere police regulation, but, by the express terms of the act, for the purpose of raising the necessary revenue to support the government.

If it is urged that no discrimination is made between those who sell imported and those who sell domestic goods it will not meet the difficulty, as said in *Robbins v. Taxing District.* The law requires of course that there shall be entire commercial equality and this precludes discrimination, but it also provides that interstate commerce cannot be taxed at all, as any tax which is imposed upon it is, in a constitutional sense, a regulation of it and void for that reason, and especially so when it restrains the importer or fetters the right of importation at any stage of this commercial intercourse. In order to fix the period when interstate commerce terminates, it has been said by the highest authority upon the subject that the criterion announced in *Brown v. Maryland,* namely, a sale in the original packages at the point of destination, is applicable and is selected as the one by which to test the validity of the power exerted in the particular case, whether by way of direct prohibition of the introduction of the goods or of their sale after they have arrived in the State, or by way of taxation, not on the goods themselves as property, but on the importer's right to sell them, which we have seen is a part of his right to import. As such taxation necessarily operates as a restriction of his right to import, it is, to that extent, as objectionable as if the sale of the goods had been actually prohibited. *Steel and Wire Co. v. Speed,* 192 U. S., 500.

We think that *Leisy v. Hardin,* 135 U. S., 100, is exactly like our case in principle. In that case it is said: "They had the right to import the beer into the State, and, in the view which we have expressed, they had the right to sell it, by which act alone it would become commingled with the common mass of property in the State. Up to that point of time we hold that, in the absence of congressional permission to do so, the State had no power to interfere by seizure, or any other action, in prohibition of importation and sale by the foreign or *non-resident* importer." [Italics ours.] Commenting on that case in *Rhodes v. Iowa,* 170 U. S., at pages 416-417, the Court, by *Mr. Justice White,* says: "Subsequently, in *Leisy v. Hardin,* the question which was thus reserved in the Bowman case arose for adjudication, and it was held that the right to sell the imported merchandise in the original package, free from interference of State laws, was protected by the Constitution of the United States, as up to such sale the goods brought into the State were not commingled with the mass of property in the State." In order to see the full force of these citations, and to furnish what we think is direct authority for our decision in this case, we need only add that the question referred to as having been reserved in *Bowman v. Ry. Co.,* 125 U. S., 465, was thus stated in *Rhodes v. Iowa, supra:* "The Court in the course of its opinion adverted to the question whether goods so shipped (from one State to another) continued to be protected by the interstate commerce clause after their delivery to the consignee and up to and including their sale in the original package by the one to whom they had been delivered, but did not decide the question, as it was not essential to do so. Referring to the subject, however, the Court said: 'It might be very convenient and useful in the execution of the policy of prohibition within the State to extend the powers of the State beyond its territorial limits. But such extra ter-

ritorial powers cannot be assumed upon such an implication. On the contrary, the nature of the case contradicts their existence; for if they belong to one State they belong to all, and cannot be exercised severally and independently. The attempt would necessarily produce that conflict and confusion which it was the very purpose of the Constitution by its delegations of national power to prevent. It is easier to think that the right of importation from abroad, and of transportation from one State to another, includes, by necessary implication, the right of the importer to sell unbroken packages at the place where the transit terminates; for the very purpose and motive of that branch of commerce which consists in transportation is that other and consequent act of commerce which consists in the sale and exchange of the commodities transported. Such, indeed, was the point decided in the case of *Brown v. Maryland,* 12 Wheat., 419, as to foreign commerce, with the express statement in the opinion of *Chief Justice Marshall* that the conclusion would be the same in a case of commerce among the States.' " As decided in *Brown v. Maryland,* sales by the importer of goods brought into the State from another State, and still in the original packages, are exempted from interference of the State by taxation, because the tax, if it were held to be valid, would intercept the import, as an import, in the way to become incorporated with the general mass of property in the State, and would deny it the privilege of becoming so incorporated until it should have contributed to the revenue of the State. This is the crucial principle, and the statement of it in *Brown v. Maryland* "contains in a nut-shell the whole doctrine upon the subject of original packages." A tax on the right to sell imported goods amounts *pro tanto* to a prohibition of the sale, because it indirectly forbids that to be done which constitutes the most valuable part of the right

to import, and "intercepts the import in the way to become incorporated with the property in the State."

In *Austin v. Tenn.,* 179 U. S., 343, we find a terse and clear statement of the effect of the decision in *Leisy v. Hardin,* as follows: "It was held (in that case) that (the goods) being articles of lawful commerce, the State could not, in the absence of legislation on the part of Congress, prohibit their importation from abroad or from a sister State; or, when imported, prohibit their sale by the importer, and that they did not become a part of the common mass of property within the State so long as they remained in the casks in which they were imported and continued to be the property of the importer." The same view is taken in the case of *Schollenberger v. Pennsylvania,* 171 U. S., 1, which involved the power of a State to forbid the introduction and the sale in original packages of oleomargarine.

In *Leisy v. Hardin,* 135 U. S., 100, the statute of Iowa prohibited the sale of intoxicating liquors brought into that State, and a sale having been made in violation of the statute, it was held that as to sales by the importer and in the original packages or kegs, unbroken or unopened, of liquors manufactured in and brought from another State, the statute was unconstitutional and void. It will be observed that the prohibition was directed not against the introduction of the goods into the State, as in *Bowman v. Railroad Co.,* but it had reference solely to their sale after they had arrived in the State. If, as we have shown, a sale after the arrival of the goods in the State cannot be prohibited, it is certain that it cannot be restricted by the imposition of a license tax. State prohibitions and State restrictions are equally unauthorized and invalid. As the Court said in *Austin v. Tennessee,* 179 U. S., 350, on the authority of *Brown v. Maryland,* there is "No difference between a power to prohibit the sale of an article while it was an import and the

power to prohibit its introduction into the country. The one would be the necessary consequence of the other. No goods would be imported if none could be sold."

It has been assumed in this case that the clause in section 44 of the Revenue Act defining a peddler applies to the occupations named in section 36, because this Court, in *Range Co. v. Carver,* held that it did, though we entertain some doubt as to whether that clause does not apply exclusively to persons named in section 44, and, if the question was presented for the first time, we would perhaps so decide. The context of that section, and the provisos immediately annexed to the clause defining a peddler, indicate that to have been the intention. But we have accepted the construction placed upon that clause of section 44 in *Range Co. v. Carver,* at least for the purpose of this decision, as the correct one.

We have treated the question involved in this case at some length, as it is of great importance to the State that the limit of her power to tax should be definitely known. We are disposed of course to sustain the validity of an act of the Legislature and will indulge every presumption in its favor. It must be clearly incompatible with constitutional provisions before we will pronounce it invalid, but when we conclude that the Legislature has exceeded its power in the particular instance it becomes our plain duty to so declare. As said in *Robbins v. Taxing District,* the State will in the end derive just as much revenue from the goods as if they had had their origin in the State. If the provision of the Constitution regulating commerce is permitted to have its free and full operation, the goods when they come into the State will, by the sale of them, whether before or after their introduction, become incorporated with the property of the State and will then be the subjects of taxation. 120 U. S., at page 497.

In any view we have been able to take of this case, after the most careful consideration and examination of the facts and the authorities, we are of the opinion that the tax is illegal and that the judgment of the Court below upon the case agreed should have been for the plaintiff.

Reversed.